**Jim JACOBS and the Estate of Warren Casey, Plaintiffs,**

v.

**FELIX BLOCH ERBEN VERLAG FUR BUHNE FILM UND FUNK KG, Grease Promotion GmbH, Theater Des Westens Gemeinnutzlge Betriebs GmbH, Brenner Holding GmbH, Thomas Krauth, and Michael Brenner, Defendants.**

**No. 98 CIV. 6623(LBS).**

United States District Court, S.D. New York.

Sept. 10, 2001.

Porzio, Bromberg & Newman, P.C., Howard J. Schwartz, Morristown, NJ, for Plaintiffs Jim Jacobs and the Estate of Warren Casey.

Loeb & Loeb LLP, David M. Satnick, New York City, for Defendant Felix Bloch Erben Verlag fur Buhne Film und Funk KG.

Alston & Bird, LLP, Gregory F. Hauser, Karl Geercken, New York City, for Defendants Grease Promotion GmbH, Theater des Westens Gemeinnutzlge Betriebs GmbH, Brenner Holding GmbH, Thomas Krauth and Michael Brenner.

## OPINION

SAND, District Judge.

The Plaintiffs, Jim Jacobs and the Estate of Warren Casey, are the exclusive

owners of all copyrights to the musical "GREASE," which Jacobs and Casey authored. (Am.Compl.¶ 14.) On November 13, 1992, the Plaintiffs licensed to Defendant Felix Bloch Erben Verlag fur Buhne Film und Funk KG ("Felix Bloch") the right to produce "GREASE" in German-speaking Europe, but in the German language only. (*Id.* ¶ 15.) The license was set to expire after three years and on November 13, 1995, the agreement was renewed through December 31, 1998. (*Id.* ¶ 42.) Felix Bloch sublicensed these rights to Brenner Holding GmbH ("Brenner Holding"), which was, at the time this action was commenced, partially owned by Defendant Michael Brenner. (Brenner Decl. 6/15/1999 ¶¶ 1–2.) Thereafter, Brenner Holding transferred its "GREASE" rights to GREASE Promotion GmbH ("GREASE GmbH"), a company jointly owned by Brenner Holding and Thomas Krauth. (*Id.* ¶ 2.)

On September 18, 1998, the Plaintiffs filed this action alleging that Felix Bloch breached the licensing agreement and that all of the Defendants infringed the Plaintiffs' copyright because the play continued to be performed after August 11, 1998, when Plaintiffs allege that the licensing agreement with Felix Bloch was terminated. (Compl.¶¶ 59–72.) On June 18, 1999, the GREASE Defendants[1] moved for dismissal for lack of personal jurisdiction and on *forum non conveniens* grounds. (6/18/1999 Mot.) Following the submission of an amended complaint and the completion of briefing, the Court heard oral argument on January 27, 2000. At that time, the Court ordered jurisdictional discovery (limited to document discovery and the depositions of Defendants Brenner and Krauth) and deferred decision on the motion to dismiss until the completion of such discovery.[2] (Tr. at 30.) On February 15, 2001, after the Plaintiffs completed jurisdictional discovery, the Defendants renewed their motion to dismiss on the grounds that, under Rule 12(b)(2) of the Federal Rules of Civil Procedure, the Court lacks personal jurisdiction over them and, alternatively, that the doctrine of *forum non conveniens* justifies dismissal. (Mot.)[3] In a declaration filed on March 13, 2001, Felix Bloch joined the GREASE Defendants' motion to dismiss on the grounds of *forum non conveniens*. (Satnick Decl.) On April 20, 2001, the Plaintiffs moved for leave to amend their complaint to add Sundance Productions, Inc. ("Sundance") as a defendant in the action. (Notice of Cross Mot.) These are the motions presently before the Court.[4]

For the reasons set forth below, the GREASE Defendants' motion to dismiss for lack of personal jurisdiction is granted.

---

1. Throughout this litigation, Brenner Holding, GREASE GmbH, Michael Brenner and Thomas Krauth (and others who are no longer part of the suit) have been collectively known as the GREASE Defendants. References to the GREASE Defendants in this Opinion are to those four Defendants (and do not include Felix Bloch).

2. At that time, the Plaintiffs consented to dismissal (without prejudice) of their cause of action against the managers of Theater des Westens. (Tr. (1/27/2000) at 24–25.)

3. In this Opinion, citation to the renewed motion to dismiss will be abbreviated to "Mot." The Plaintiffs' brief in opposition is referred to as "Resp." and the Defendants' Reply is "Reply." Unless there is only a single version of a particular document, references to court documents other than these three filings will include a date.

4. The Court heard oral argument on July 17, 2001, at which time the Plaintiffs consented to the dismissal of Theater des Westens as a defendant in this suit. (Tr. at 3.) The Plaintiffs also clarified that, despite a reference to the contrary in their papers (*see* Resp. at 2), they had not made a cross motion for summary judgment. (Tr. at 2–3.)

Defendant Felix Bloch's motion to dismiss for *forum non conveniens* is denied. Plaintiffs' motion for leave to amend the complaint to add Sundance Productions as a party is also denied.

## I. FACTS

### A. Background

Plaintiff Jim Jacobs is a resident of California. (Am.Compl.¶ 4.) The Estate of Warren Casey is administered by the Harris Trust & Savings Bank, of Chicago, Illinois. (*Id.* ¶ 5.) Felix Bloch, GREASE GmbH and Brenner Holding are corporate societies organized under German law and with their principal places of business in Germany. (*Id.* ¶¶ 6–9; Brenner Decl. ¶ 2.) Messrs. Michael Brenner and Thomas Krauth are German residents. (Am. Compl.¶¶ 10–11.)

The initial licensing agreement between the Plaintiffs and Felix Bloch was executed in New York and contains a choice of law clause, providing for the application of New York State laws. (*Id.* ¶ 16.) The sublicensing agreements, between Felix Bloch and Brenner Holding and between Brenner Holding and GREASE GmbH, were negotiated and executed in Germany. (Brenner Decl. 6/15/1999 ¶ 2.) To be clear, none of the GREASE Defendants has entered into any direct contractual relationship with the Plaintiffs. (Mot. at 3.)

The relationship among the various entities known as the GREASE Defendants and between the GREASE Defendants and two other non-party companies, Sundance and BB Promotion, is at the center of the jurisdictional inquiry. As of September 1998, at the commencement of this action, Defendant Michael Brenner owned 26% of the shares of Brenner Holding and BB Promotion and his wife held the other 74% of those companies.[5] (Dietmann 6/1/2001 Decl. ¶ 8.) Brenner is also the sole shareholder of Sundance, a New York corporation. (Brenner 6/15/1999 Decl. ¶ 6.). Although he does not have a direct ownership interest in GREASE GmbH, which is jointly owned by Krauth and Brenner Holding,[6] Brenner does serve as the Executive Secretary and Creative Director for GREASE GmbH. (Brenner 10/15/1999 Decl. ¶ 3.)

Defendant Thomas Krauth does not have any ownership interest in Brenner Holding, Sundance or BB Promotion and has never been an employee of those companies. (Krauth 6/1/2001 Decl. ¶ 2; Dietmann 6/1/2001 Decl. ¶¶ 6–7.) During the period between 1992 and 1995, Krauth did, however, perform consulting services for Brenner Holding and BB Promotion. (*Id.*) Krauth is a shareholder of GREASE GmbH and acts as the company's General Manager. (Krauth 6/15/1999 Decl. ¶ 1; Dietmann 6/1/2001 Decl. ¶ 7.) Like Krauth, GREASE GmbH and Brenner Holding do

---

**5.** For the purposes of the jurisdictional analysis under New York State law, the Court focuses specifically on the Defendants' amenability to suit at the time the lawsuit was filed, not when the claim arose (and not based on subsequent changes in their status). *See Yurman Designs, Inc. v. A.R. Morris Jewelers, L.L.C.*, 41 F.Supp.2d 453, 457 (S.D.N.Y.1999); *BHP Trading (UK) Limited v. Deep Sea International Shipping Co.*, No. 90 Civ. 2231, 1991 WL 198747, at *6 (S.D.N.Y. Sept. 23, 1991). Thus, the fact that as of September 2000, Brenner's ownership interest in Brenner Holding and BB Promotion had increased

(Brenner Dep. at 7–8) is not relevant to the Court's analysis.

**6.** There appears to be some discrepancy in the record about Krauth's interest in GREASE GmbH, which may be a function of the fact that in some places there is no reference to the date being discussed. *Compare* Brenner Dep. at 45 (suggesting that Krauth owns 66% of GREASE GmbH) *with* Dietmann 6/1/2001 Decl. ¶¶ 6–7 (claiming that Krauth has only a 25% interest in GREASE GmbH).

not own any interest in Sundance or BB Promotion. (Dietmann 6/1/2001 Decl. ¶ 6.) Finally, with respect to the relationship between Brenner and Krauth, while Krauth admits that on occasion he has used the term "partner" to let people know that he and Brenner have teamed up on certain projects, he claims that he has never entered into a legal partnership "pursuant to which profits and losses of a business were shared by us individually." (Krauth 6/1/2001 Decl. ¶ 3.)

GREASE GmbH, Brenner Holding, BB Promotion and Sundance are corporations that were separately formed and separately capitalized. (Dietmann 6/1/2001 Decl. ¶ 4; Brenner 6/1/2001 Decl. ¶ 3.) The German corporations, GREASE GmbH, Brenner Holding and BB Promotion were registered as independent corporate societies in the *Handelsregister*, a German corporate registry. (Dietmann 6/1/2001 Decl. ¶ 4.) GREASE GmbH, Brenner Holding, BB Promotion and Sundance maintain their own books and records, manage their own separate bank accounts and do their own hiring. (Brenner 6/1/2001 Decl. ¶ 4.) Brenner claims that he "always observed corporate formalities with respect to each of the these entities, never loaned any of these entities any funds, never interfered with their day-to-day operations, and never entered into a business transaction with any of these entities on [his] own behalf." (*Id.*)

The Plaintiffs challenge the assertion by Brenner that the corporations were strictly separate. In their response, they point out that some of these corporations share German addresses with other Brenner or Krauth affiliated corporations, although they do not appear to use the same phone number. (Schwartz Cert.App. K.) In addition, BB Promotion and GREASE GmbH share at least one management level employee. (Resp. at 14.) Finally, the Plain-

tiffs highlight numerous charges on receipts from the GREASE GmbH credit card which contain notations signaling that some of the charges on the card were Brenner's private charges or charges for BB Promotion. (*See* Schwartz Cert. Apps. C, D, E.) The Defendants argue that these notations—which read "privat" (private) or "weiter an BB" (pass on to BB)—were made so that inadvertent charges could be passed on to the appropriate entity. (Brenner 6/1/2001 Decl. ¶ 7.) According to Brenner, these charges were generally reimbursed "within a month of the inadvertent charge." (*Id.*)

The Defendants characterize the primary business of GREASE GmbH and Brenner Holding as "the production of plays in Germany and other countries in Europe." (Brenner 10/15/1999 Decl. ¶ 12.) In the case of "GREASE", however, Brenner Holding was not involved with the actual production of the musical and, instead, sublicensed its rights to GREASE GmbH, which produced the Musical in Germany and Switzerland. (*Id.* ¶ 3.) BB Promotion has promoted a wide range of different shows in Europe and characterizes itself as a "leading theatrical organizer." (Brenner Dep. at 29–30.) Despite Plaintiffs' claims to the contrary, BB Promotion is not dependent on Brenner Holding for the rights to the shows it promotes. From 1994 to 1999, for only four of the 32 productions to which BB Promotion obtained the rights were the rights obtained from Brenner Holding. (Brenner 6/1/2001 Decl. ¶ 5.) Sundance, the New York corporation, works primarily with BB Promotion to secure talent for the Harlem Gospel Singers. (*Id.* at 9.)

## B. The GREASE Defendants' Contacts with New York—Generally

GREASE GmbH and Brenner Holding are not licensed to do business in New

York and they conduct no advertising in New York. (Mot. at 3; Brenner 6/15/1999 Decl. ¶ 4.) They do not have New York offices, warehouses, or other real property. (*Id.*; Krauth 6/15/1999 Decl. ¶ 4.) None of the GREASE Defendants have telephone listings or bank or brokerage accounts in New York. (*Id.*) Brenner and Krauth also do not have New York residences, offices, telephone listings or bank accounts. (Brenner 6/15/1999 Decl. ¶ 5; Krauth 6/15/1999 Decl. ¶ 4.)

Brenner Holding owns the rights to "The Harlem Gospel Singers," which has never been produced or performed in New York. (Brenner 2/14/2001 Decl. ¶ 5.) In January 1995, Brenner Holding hired Roseanne Kirk, a New York resident, to act as a consultant for "The Harlem Gospel Singers." (*Id.*) Kirk's contract provided that she was "to perform all duties of consultancy, organization and representation of producer's activities in New York City for the U.S.A. and to maintain a telephone and fax connection for the convenience of the parties." (Schwartz Cert. App. M.) According to Michael Brenner, Kirk, as the "supervising producer," was responsible for the "artistic production" of the show which included research, choosing titles, obtaining the rights to music, and auditioning and choosing talent for the show. (Brenner Dep. at 17, 37–39.) The Defendants contend that Ms. Kirk was hired pursuant to an "arms-length transaction" (Brenner Decl. June 1, 2001, ¶ 8) and emphasize that she "was not authorized to enter into contracts on Brenner Holding's behalf" (Brenner 2/14/2001 Decl. ¶ 5).

It is not disputed that Defendant Michael Brenner travels to New York an average of four to five times per year. (Mot. at 4.) Brenner claims that most of these trips are on behalf of BB Promotion, including his annual December trip to the Alvin Ailey Gala. (Brenner 10/15/1999 Decl. ¶ 13; Brenner Dep. at 65.) Generally, when he is in New York, Brenner has access to the Sundance offices, but he does not maintain a permanent office there. (Brenner 6/15/1999 Decl. ¶ 6.) Defendant Thomas Krauth has traveled to New York much less frequently than Brenner, averaging approximately one or two trips per year. (Krauth Dep.)

### C. New York Contacts for "GREASE"

On three or four occasions in 1996 and 1997 and on three more occasions in 1998, Brenner viewed auditions for "GREASE" in New York. (Brenner 10/15/1999 Decl. ¶ 4.) Defendants Brenner Holding and Thomas Krauth were not at all involved in these auditions and, in general, did not participate in the selection of actors for the Musical. (*Id.*) Other employees of GREASE GmbH were, however, involved in the auditions. (Brenner Dep. at 43.) GREASE GmbH retained Sundance to organize the auditions, including renting the audition studio and making other arrangements. (*Id.* at 42.) Sundance was not, however, involved in any of the artistic decisions relating to the auditions (*id.*) and had no authority to make contracts on behalf of GREASE GmbH (Brenner 6/1/2001 Decl. ¶ 8). Brenner characterized this transaction between Sundance and GREASE GmbH as an "arms length deal" (Brenner Dep. at 43) for which Sundance was reimbursed and was paid a fee (*see* Schwartz Cert. App. G at GR 0528).

In February 1996, GREASE GmbH retained Baron Atlantics Ltd. ("BAL") to assist in auditioning actors, but that relationship was terminated when BAL failed to perform. (Brenner 2/14/2001 Decl. ¶ 3.) A single payment of $32,000 was paid by GREASE GmbH to BAL. (*Id.*; Schwartz Cert. App. O at GR 0170.) GREASE GmbH also hired William Meade, Inc., a New York company, to assist in obtaining

musicians for the musical. (Mot. at 5.) The Defendants characterize Meade as an "independent musical contractor." (*Id.; see also* Schwartz Cert.App. O at GR 0536–37 (discussing "contracting services" or "contractor expenses").) Despite these audition contacts in New York, the Defendants claim that the main source for actors and musicians for the musical was Europe and that "most auditions for the Musical took place in European cities." (Krauth Dep. at 18, 35.) Finally, from 1995 through 1998, GREASE GmbH employed Dennis Callahan of Great Enterprises, Inc., (a New York company) as a director/choreographer of the German production. (Schwartz Cert.App. F at GR 0533.)

In addition to finding talent in New York, GREASE GmbH also ordered supplies for use in its performances from stores in New York. (Mot. at 5.) According to the Plaintiffs, GREASE GmbH "did at least $32,000 worth of business reflecting at least thirty-three (33) separate business transactions [mostly purchases of costumes, wigs makeup and props] with New York theatrical supply stores." (Resp. at 4; Schwartz Cert.App. N.)

The Plaintiffs do not allege that any of the decisions regarding the translations to be used, adjustments to the text of the musical or the language in which songs should be sung were made in New York. The Defendants assert that all such decisions were made in Germany and "had nothing whatsoever to do with any activity in New York." (Brenner 6/1/2001 Decl. ¶ 9.)

### D. The "Chicago" Negotiations

On at least two occasions, Brenner and Krauth attended meetings in New York, attempting to acquire the rights to produce the musical "Chicago" in Germany. (Mot. at 5.) Certain of the expenses associated with these visits and meetings were paid by GREASE GmbH. (*Id.*) Defendants indicate that it was their intention to reimburse GREASE GmbH, after forming a new company, Chicago Deutschland GmbH, "which would hold the rights to "Chicago", produce and perform the Play in Germany and pay all expenses associated therewith." (Krauth 6/1/2001 Decl. ¶ 5.) Several letters regarding the "Chicago" negotiation were sent on GREASE GmbH letterhead and two facsimiles were sent by Michael Brenner on BB Promotion letterhead. (Schwartz Cert. Apps. H, J, R.) At that time, the Defendants' efforts to acquire "Chicago" were unsuccessful. (Krauth 6/1/2001 Decl. ¶ 5.) Earlier this year, however, another Brenner/Krauth company, Capitol Event GmbH, acquired the rights to "Chicago" and the 1997–98 expenditures relating to the negotiations for "Chicago" have since been reimbursed by Capitol Event GmbH to GREASE GmbH. (*Id.*)

Sundance also played a role in the 1997–98 efforts to acquire "Chicago" by retaining a New York attorney to assist GREASE GmbH during the negotiations. (Brenner Dep. at 54–55; Schwartz Cert. App. J.) However, Sundance's expenditure for the attorney in question were "immediately reimbursed" by GREASE GmbH. (Krauth 6/1/2001 Decl. ¶ 4.)

### E. Brenner and Krauth's Meeting with Attorney Ronald Taft

In May 1998, Messrs. Brenner and Krauth met with Mr. Ronald Taft, an attorney who represents the Plaintiffs and their copyright interests in "GREASE." (Taft Decl. ¶¶ 1, 4.) According to Taft, at that meeting, "all aspects of defendants' production of the Play" were discussed, "including the terms of their sub-license." (*Id.* ¶¶ 4, 6.) Taft asserts that it was at this meeting with Brenner and Krauth that he

first learned that a second translation of the play had been commissioned by the two producers and that they had modified the original text of the play. (*Id.* ¶ 5.) Mr. Brenner contradicts this account of the meeting claiming that there was no discussion of "any creative aspects of the production of the musical in Germany." (Brenner 12/12/1999 Decl. ¶ 4.) It is undisputed that, at the meeting, Brenner and Krauth inquired about the possibility of directly licensing the rights to the musical from the Plaintiffs, as opposed to continuing to sublicense the copyright through Felix Bloch. (*Id.* ¶¶ 3–4; Taft Decl. ¶ 5.) Brenner claims that he and Mr. Krauth visited Mr. Taft on behalf of GREASE GmbH because they had recently learned from a representative that Felix, Bloch's rights to the musical would expire at the end of 1998. (Brenner 12/12/1999 Decl. ¶ 3.) Taft claims that Brenner and Krauth told him, "[i]n an attempt to sell themselves . . . as seasoned producers, . . . that they regularly visit New York for the purpose of both viewing plays in New York, and negotiating the rights to plays that they are interested in producing in Europe." (Taft Decl. ¶ 8.) Brenner disputes Taft's characterization of his comments as any sort of sales pitch. (Brenner 10/15/1999 Decl. ¶ 9.)

Following the meeting, Taft wrote to Brenner and Krauth, apparently confirming what he had told them at the meeting: that "the license to Felix Bloch Erben expires December 31, 1998." (Taft Decl. App. M.) From June 5, 1998 through July 1, 1998, in six separate letters to Taft, Brenner and Krauth made increasingly detailed written offers for an agreement whereby they could, beginning in January 1999, directly license the rights to "GREASE" in German-speaking Europe. (*Id.* ¶ 5, Apps. B—G (letters); Brenner 10/15/1999 Decl. ¶ 11.) In a July 1, 1998, correspondence to Brenner and Krauth,

Taft relayed that the Plaintiffs declined to accept their offer. (Taft Decl.App. H.)

## II. DISCUSSION

### A. Personal Jurisdiction—the GREASE Defendants

The Plaintiffs assert numerous and seemingly shifting bases for personal jurisdiction over the GREASE Defendants which are all, in some way, dependent upon the Plaintiffs' view of an overarching Brenner–Krauth Enterprise. The jurisdictional claims can be generally categorized as follows.

The Plaintiffs offer three *general* jurisdiction arguments. First, they claim that Defendants Brenner, Krauth and GREASE GmbH are directly subject to the Court's jurisdiction because they were, themselves, "doing business" in New York. Their second claim is that all of the GREASE Defendants are vicariously present in New York through their relationship with BB Promotion and Sundance. It is the Plaintiffs' view that the BB Promotion and Sundance are "mere departments" of the GREASE Defendants. The third, and final, general jurisdiction argument put forth by the Plaintiffs is an agency claim: the Plaintiffs allege that Sundance has served as an agent of all of the GREASE Defendants in New York and, in addition, that Defendants Brenner and Brenner Holding have maintained an agency relationship with Ms. Roseanne Kirk, a New York resident.

With respect to their *specific* jurisdiction claims, the Plaintiffs argue that Krauth, Brenner and GREASE GmbH engaged in various meetings, auditions and other transactions in New York that are substantially linked to the copyright infringement alleged in this case. Each of these jurisdictional allegations is addressed below.

■ The Plaintiffs bear the burden of establishing that the Court has personal jurisdiction over the Defendants. *Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 507 (2d Cir.1994). Where, as in this case, a motion to dismiss for lack of personal jurisdiction is made after jurisdictional discovery, but without an evidentiary hearing, the plaintiff must make a prima facie showing that jurisdiction exists. *Hoffritz for Cutlery, Inc. v. Amajac, Ltd.*, 763 F.2d 55, 57 (2d Cir.1985). This showing "must include an averment of facts that, if credited by the trier, would suffice to establish jurisdiction over the defendant." *Ball v. Metallurgie Hoboken–Overpelt*, 902 F.2d 194, 197 (2d Cir.1990). Under these circumstances, the Court is to construe all of the pleadings and affidavits "in the light most favorable to plaintiff" and must resolve doubts in the plaintiff's favor. *Hoffritz*, 763 F.2d at 57. At the same time, particularly given the amount of time provided for jurisdictional discovery, the Court will limit its jurisdictional analysis to the facts presented and must assume that the Plaintiffs have provided all the evidence they possess to support their jurisdictional claims. *Unicon Management Corp. v. Koppers Co.*, 250 F.Supp. 850, 853 (S.D.N.Y.1966).

■ The basis for subject matter jurisdiction in this case is diversity. 28 U.S.C. § 1332. As a result, whether the Court has personal jurisdiction over the Defendants (none of whom are from the state of New York) is a question to be resolved in accordance with New York state law. *Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.*, 751 F.2d 117, 120 (2d Cir.1984) ("[P]ersonal jurisdiction in a diversity case is determined by the law of the state in which the district court sits."); *Arrowsmith v. United Press Int'l*, 320 F.2d 219, 222–25 (2d Cir.1963) (same).

### 1. General Jurisdiction

■ Under N.Y. C.P.L.R. § 301, a foreign corporation is subject to general jurisdiction in New York if the corporation is "doing business" in the state.[7] The "doing business" standard is a stringent one because a corporation which is amenable to the Court's general jurisdiction "may be sued in New York on causes of action wholly unrelated to acts done in New York." *Ball*, 902 F.2d at 198. The rule is that "a corporation is 'doing business' and is therefore 'present' in New York ... if it does business in New York 'not occasionally or casually, but with a fair measure of permanence and continuity.'" *Hoffritz*, 763 F.2d at 58 (quoting *Tauza v. Susquehanna Coal Co.*, 220 N.Y. 259, 267, 115 N.E. 915 (1917)). More recent Second Circuit decisions have clarified that the *Hoffritz–Tauza* standard requires a showing of "'continuous, permanent, and substantial activity in New York.'" *Wiwa v. Royal Dutch Petroleum, Co.*, 226 F.3d 88, 95 (2d Cir.2000) (quoting *Landoil Resources Corp. v. Alexander & Alexander Servs., Inc.*, 918 F.2d 1039, 1043 (2d Cir. 1990)).

### a. Doing Business: Brenner and Krauth

■ The Plaintiffs claim that Defendants Brenner and Krauth each have sufficient contacts with New York to satisfy the

---

7. At common law, prior to the enactment of C.P.L.R. § 301, New York courts could exercise general jurisdiction over foreign corporations which were "doing business" in the state. *See Hoffritz*, 763 F.2d at 58. Because Section 301 provides that "[a] court may exercise such jurisdiction over persons, property or status as might have been exercised heretofore," "doing business" in New York continues to be a basis for general jurisdiction.

§ 301 "doing business" standard.[8] It is the Plaintiffs' belief that Brenner and Krauth have endeavored to establish themselves in the New York theatrical community as first-class producers and, in so doing, have generated goodwill that should factor into the "doing business" calculus.[9] (Resp. at 23.) Brenner and Krauth do not deny that during the relevant time period, they spent time in New York viewing theater productions, negotiating for rights to plays, casting and hiring talent for their productions in Germany, and purchasing supplies. These activities, however, are simply insufficient to meet the § 301 standard. Faced with similar facts, Judge Mukasey, in *Mantello*, explained that the defendants in that case were not subject to general jurisdiction:

> [The defendant's] visits to New York to review current theater, even if for the

purpose of determining which plays Caldwell should produce, is not 'doing business.' Hiring New York actors for productions in Florida and obtaining licenses is not 'doing business.' Through these activities, defendants, in essence, merely secure the goods and services they need—plays, actors and licenses—to do their business in Florida, i.e., produce plays.

947 F.Supp. at 98.[10]   *Cf. Chase Manhattan Bank v. AXA Reassurance UK PLC,* N.Y.L.J., August 9, 2001 (S.D.N.Y. Aug. 6, 2001) (holding that "occasional use of New York as a filming location, without other indicia of corporate presence such as offices, bank accounts, and employees, does not constitute 'doing business' for purposes of CPLR 301"). The Plaintiffs' effort to distinguish *Mantello* because of the Defendants' meeting and correspondence with

**8.** Whether an individual may properly be the focus of a "doing business" inquiry or whether that standard should be reserved for jurisdiction over corporations has been the subject of some debate. *See Hoffritz,* 763 F.2d at 58 (raising, but not resolving, this question). The Second Circuit has applied the rule to non-corporate organizations. *See Klinghoffer v. S.N.C. Achille Lauro,* 937 F.2d 44, 50 (2d Cir.1991). Some courts in this district have, without addressing the issue, subjected individual defendants to the "doing business" test. *See Forgash v. Paley,* 659 F.Supp. 728, 730 (S.D.N.Y.1987); *Mantello v. Hall,* 947 F.Supp. 92, 98 (S.D.N.Y.1996), *vacated on other grounds by,* No. 98 Civ. 4871, slip op. (S.D.N.Y. Mar. 1, 1999). At present there appear to be no New York Court of Appeals cases resolving the issue. *See Laufer v. Ostrow,* 55 N.Y.2d 305, 313, 449 N.Y.S.2d 456, 434 N.E.2d 692 (1982) (assuming the applicability of § 301 to individuals but not deciding the question because the contacts with the individual were too insubstantial). The lower state courts are divided. *Compare ABKCO Industries, Inc. v. Lennon,* 52 A.D.2d 435, 384 N.Y.S.2d 781 (1st Dep't 1976) (holding that Beatles drummer Ringo Starr was "doing business" in New York), *with Nilsa B.B. v. Clyde Blackwell H.,* 84 A.D.2d 295, 445

N.Y.S.2d 579 (2d Dep't 1981) (holding that CPLR § 301 was not intended to reach individuals). In this case, like *Laufer,* because the Plaintiffs have not made a persuasive showing that Brenner and Krauth have been "doing business" in New York, the Court need not resolve the issue.

**9.** The Plaintiffs have cited no cases (and the Court has found none) for the proposition that the existence of a positive business reputation or other goodwill in New York would be sufficient to establish personal jurisdiction over the Defendants. These concepts are too abstract and intangible to factor meaningfully into the personal jurisdiction calculus. The Court will focus, instead, on the Defendants' actual contacts which the Plaintiff asserts, were part of the Defendants' effort to develop their reputation and to generate business in New York.

**10.** Facts subsequently disclosed about the Defendants' soliciting activities in New York led Judge Mukasey to withdraw this opinion. *See Mantello v. Hall,* No. 98 Civ. 4871, slip op. (S.D.N.Y. Mar. 1, 1999). These developments do not disturb the sound reasoning of the opinion as to the facts available at the time it was filed.

Ronald Taft (*see* Resp. at 24) is unpersuasive both because the meeting with Taft does not qualify as "transacting business" for specific jurisdiction purposes (*see infra*) and because a single New York visit does not significantly alter the "doing business" calculus.

The Defendants' occasional trips to New York—Brenner estimates an average of four to five visits per year—are an insufficient basis for jurisdiction. *See, e.g., Bozell Group, Inc. v. Carpet Co-op of America Assoc., Inc.*, No. 00 Civ 1248, 2000 WL 1523282, at \*5 (S.D.N.Y. October 11, 2000) (two visits in three months insufficient); *Aquascutum of London, Inc. v. S.S. American Champion*, 426 F.2d 205, 211 (2d Cir.1970) (visits every few months insufficient); *Hoffritz*, 763 F.2d at 57–58 (fifty-four visits to New York insufficient). Likewise, the Defendants' New York purchases are also insufficient to establish their presence. *See Rosenberg Bros. & Co. v. Curtis Brown Co.*, 260 U.S. 516, 518, 43 S.Ct. 170, 67 L.Ed. 372 (1923); *Rolls-Royce Motors, Inc. v. Charles Schmitt & Co.*, 657 F.Supp. 1040, 1046 (S.D.N.Y. 1987).

Finally, the Plaintiffs suggest that the Defendants' efforts to secure the rights to plays during some of these trips to New York trigger the application of the "solicitation-plus" rule. Under that rule, although mere solicitation of business in New York does not subject a corporation to "doing business" jurisdiction, engaging in "activities of substance in addition to solicitation" does. *Laufer*, 55 N.Y.2d at 310, 449 N.Y.S.2d 456, 434 N.E.2d 692. It is not exactly clear what activities of the Defendants are being characterized as solicitation, although the Plaintiffs do say that the Defendants' New York activities were part of an effort to "sell themselves in New York as first class producers." (Resp. at 24.) It is the view of this Court that efforts to acquire the rights to plays or musicals in New York are not properly characterized as solicitation. *Cf. Dunn v. Southern Charters, Inc.*, 506 F.Supp. 564, 567 (E.D.N.Y.1981) (discussing various forms of solicitation, including directly seeking orders for goods, distributing brochures and placing listings in supply guides); *Laufer*, 55 N.Y.2d at 310, 449 N.Y.S.2d 456, 434 N.E.2d 692 (suggesting that the solicitation test is appropriately applied to foreign manufacturers or purveyors of services).

Solicitation or otherwise, the activities of the Defendants in New York are simply not as systematic or continuous as the law requires. *See Dogan v. Harbert Const. Corp.*, 507 F.Supp. 254, 260 (S.D.N.Y.1980) ("Occasional visits, even to negotiate a contract, have been found to fall short of the 'doing business' standard."). The main focus of the Defendants' business is the production and promotion of plays in Europe. While the New York acts may "enhance" the Defendants' business, they are still "incidental" to their business. *Jayne v. Royal Jordanian Airlines*, 502 F.Supp. 848, 856 (S.D.N.Y.1980). *See also Mantello*, 947 F.Supp. at 98 (refusing, on similar facts, to find that defendant was doing business in New York). In light of these precedents, the Court rejects the Plaintiffs' argument that Defendants Brenner and Krauth were "doing business" in New York under C.P.L.R. § 301.

■ The Plaintiffs' next general jurisdiction arguments are premised on two "attribution theories." *Landoil*, 918 F.2d at 1046 n. 12. These are means by which a plaintiff can establish general "doing business" jurisdiction over a defendant even where the defendant's contacts, standing alone, are insufficient to satisfy the traditional test. Under New York law, a court may obtain jurisdiction over a foreign corporate defendant: 1) if it has a subsidiary

or affiliate in New York which is a "mere department" of the foreign corporation or 2) if it employs or retains a local entity to act as its agent. *Bialek v. Racal–Milgo, Inc.,* 545 F.Supp. 25, 32 (S.D.N.Y.1982). As Judge Weinstein explained, "[t]hese apparently distinct notions are metonyms for a jurisdictional balancing assessing the fairness of requiring an out-of-state party to defend itself in New York when it derives benefits from in-state activities." *Bulova Watch Co., Inc. v. K. Hattori & Co., Ltd.,* 508 F.Supp. 1322, 1334 (E.D.N.Y. 1981).

### b. The Mere Department Test

█ To satisfy the mere department test, the Plaintiffs must show that the GREASE Defendants disregarded the separate corporate existence of Sundance and BB Promotion. *Beech,* 751 F.2d at 120. A corporate entity is consider to be a "mere department" of a parent company only where the control of the lesser entity is "pervasive enough that the corporate separation is more formal than real." *H. Heller & Co. v. Novacor Chemicals Ltd.,* 726 F.Supp. 49, 54 (S.D.N.Y.1988). As set forth by the Second Circuit in *Beech,* the test for evaluating whether one corporation is a mere department of another involves consideration of four factors. Proof of "nearly identical ownership interests," the first factor, is "essential" to a finding that one corporation is a "mere department" of another. *Beech,* 751 F.2d at 120. The other three factors include "the financial dependency of the subsidiary on the parent corporation;" "the degree to which the parent interferes in the selection and assignment of the subsidiary's executive personnel and fails to observe corporate formalities;" and the extent of the parent's control over the subsidiary's marketing and operational policies. *Id.* at 121–22. Courts will find a mere department where separate corporations function, in reality,

as "integral" parts of a "united endeavor." *Titu–Serban Ionescu v. E.F. Hutton & Company S.A.,* 434 F.Supp. 80, 82 (S.D.N.Y.1977).

█ Under the "common ownership" prong of the test, the Plaintiffs must show that the relevant companies have "nearly identical" ownership interests. Based on the information provided by the Defendants, it appears that this factor could only be satisfied with respect to Defendants Michael Brenner and Brenner Holding, because they are the only GREASE Defendants with ownership interests in either Sundance or BB Promotion.

The Plaintiffs contend, however, that Brenner and Krauth together own nearly all of the interests at issue and that the two have "formed a partnership to engage in a theater production business through the incorporation of various entities—some jointly owned, some owned individually— that exist solely for the purpose of playing their respective roles in the furtherance of the partnership's unified endeavor, which is to bring theater productions from New York to Germany." (Resp. at 7–8.) The Plaintiffs claim that each of the "individual" corporations functions as a department of the overarching Brenner–Krauth enterprise and that each was created to fulfill specific needs of the enterprise as a whole:

> Brenner Holding is the equivalent of the product acquisition department, as it obtains rights to major theatrical productions and then transfers them to another Brenner–Krauth company. Sundance is the operations and talent development office, appropriately located in New York, as it organizes performances and obtains talent for Brenner–Krauth theatrical productions. The various companies such as GREASE GmbH, BB and Saturday Night Fever GmbH are akin to individual product marketing and pro-

duction departments, as they produce and perform Brenner–Krauth theatrical productions. (Resp. at 6.)

Defendants Brenner and Krauth deny having formed any such partnership. *But see Saward v. Saward,* 119 Misc. 676, 197 N.Y.S. 123, 124–25 (1922) (explaining that partnerships "may grow out of transactions or relations in which the word 'partnership' is not uttered"). Even to prove the existence of an implied partnership, though, there must be some evidence that Brenner and Krauth intended to become partners. The fact that, on occasion, Brenner or Krauth may have referred to one another as a partner (*see* Resp. at 8–9), is not dispositive. Rather, there must be some evidence that the two intended to incur individual liability for losses. *Smith v. Dunn,* 44 Misc. 288, 89 N.Y.S. 881, 885–86 (1904) ("An agreement for one to pay another, who does not in any sense incur liability for losses, a share of the profits by way of compensation, does not create a partnership."). Without factual support, the Plaintiffs' bare assertion that "Brenner and Krauth share the profits of their endeavors, along with the risk of loss" (Resp. at 9), which the Defendants both deny, cannot be credited by the Court. Ultimately, coordination among commonly owned companies, without more, is insufficient to satisfy the mere department test.

Thus, there is no way for Plaintiffs to sustain their "mere department" allegations against Thomas Krauth and GREASE GmbH because the requisite common ownership element cannot be satisfied with respect to these Defendants. *See Levant Line, S.A. v. Marine Enter-*

*prises Corp.,* 166 B.R. 221, 231 (Bankr. S.D.N.Y.1994) ("If common ownership is not established, the inquiry ends."). With respect to Defendants Brenner and Brenner Holding, the situation is different. The common ownership prong is admittedly met because of Brenner's interests in Brenner Holding, BB Promotion and Sundance.[11] (Reply at 10.)

With respect to the second *Beech* factor, the Plaintiffs allege that there is a "chain of financial dependence" from Sundance to BB Promotion to Brenner Holding (Resp. at 11) but offer little factual support for this assertion. Although it is undisputed that Sundance and BB Promotion work together on the Harlem Gospel Singers, merely sharing a common interest or stake in the outcome of a joint venture does not establish the degree of financial dependence that the cases require. *Cf. Beech,* 751 F.2d at 121 (finding corporation to be a mere department of the defendant where it had received numerous loans from the defendant (which were "as yet uncollected and without a payment date") and was "wholly dependent upon [the defendant's] financial support to stay in business"). Further, the Plaintiffs' undocumented claim that "BB's ability to generate revenue is wholly dependent on Brenner Holding's acquisition of the rights to perform plays" is simply not borne out by the evidence. (*See* Brenner 6/1/2001 Decl. ¶ 5 (explaining that only four of 32 productions put on by BB Promotion were acquired through Brenner Holding).)

Defendant Brenner has stated in his affidavit that each of these corporations maintains its own books and records, has its own bank accounts and functions inde-

---

**11.** The fact that Brenner has an interest in Brenner Holding, which in turn has an interest in GREASE GmbH is too remote a chain for the Court to consider GREASE GmbH to be a common owner of Sundance or BB Promotion. (*See* Reply at 10 (citing to *Levant,* 166 B.R. at 232 ("[N]early identical ownership interests must be found before one corporation can be considered a mere department of another.")))

pendently in its day-to-day operations. (*See id.* ¶¶ 3–4.) The Plaintiffs have submitted no credible evidence that these representations are inaccurate. *See Anderson v. Indiana Black Expo, Inc.*, 81 F.Supp.2d 494, 500 (S.D.N.Y.2000) (explaining that plaintiff, to defend jurisdiction motion, has the obligation to rebut defendant's evidence). In addition, the Plaintiffs have provided no evidence for their claim that various loans between the GREASE Defendants, Sundance and BB Promotion have not been repaid, so the suggestion that they have somehow managed to shift the burden to the Defendants (*see* Letter from H. Schwartz to the Court of 8/28/2001, at 2) is without merit. The proof offered by the Defendants does not contradict the evidence introduced by the Plaintiffs, so this is not a situation where any doubts or inconsistencies need be resolved in the Plaintiffs' favor. The Court finds that the Plaintiffs have failed to demonstrate that Sundance, BB Promotion or Brenner Holding are financially dependent, either on each other, or on Defendant Michael Brenner.

Financial dependence, though, is only one of the *Beech* factors. *Beech* also specifies that a court should consider the degree to which a foreign corporation interferes with its New York subsidiary or affiliate and should assess the extent to which corporate formalities have been observed. *Beech*, 751 F.2d at 121. A parent corporation's control of the marketing and operational policies of the subsidiary is the fourth and final *Beech* factor. *Id.* at 122. The fact that Brenner Holding acquired the rights to "GREASE" from Felix Bloch and then sublicensed those rights to GREASE GmbH simply does not demonstrate to the Court a failure to observe corporate formalities. Likewise, the fact that GREASE GmbH later retained Sundance to assist with New York auditions or to hire an attorney for the "Chicago" negotiations doesn't significantly affect the actual separation between the different corporations, particularly because these were business transactions for which Sundance was reimbursed and paid a fee. (Schwartz Cert.App. G at GR 0528.) Although the Plaintiffs point to one management level employee shared by GREASE GmbH and BB Promotion, that simply doesn't rise to the level of overlap discussed by *Beech*. *See* 751 F.2d at 121–22.

According to the Plaintiffs, the GREASE GmbH credit card bills "illustrate the degree to which Brenner and Krauth commingled the funds and debts of BB, GREASE GmbH and themselves." (Resp. at 13.) Plaintiffs were aware of this alleged "commingling" because of the various notations that appeared on the bills, which indicated the proper source for various charges. These notations, indicating, for example, that some of the charges were Brenner's private charges or that other charges should be forwarded to BB Promotion, contrary to Plaintiffs' view, are significant evidence that even on occasions where funds were temporarily borrowed, the Defendants were careful to account separately for the different corporations and for their individual funds. The fact that these debts were promptly repaid (*see* Brenner 6/1/2001 Decl. ¶ 7), only reinforces that reading. Neither Sundance nor BB Promotion have received any loans from the GREASE Defendants. (*Id.* ¶¶ 3–4.) The transactions between Brenner or Brenner Holding and Sundance or BB Promotion have been "carried out on an arm's length basis." (*Id.* ¶¶ 3, 8; Krauth 6/1/2001 Decl. ¶ 4.) BB Promotion and Sundance "charge market rate for their services." (Reply at 10.) And Mr. Brenner "has never entered into a transaction of business on his own behalf with either BB Promotion or Sundance." *Id.*

According to the GREASE Defendants, Sundance and BB Promotion are separately incorporated entities, which keep their own books, records and accounts, which hire their own employees, and which operate day-to-day without direction from Brenner or Brenner Holding on operational or marketing policies. (Brenner 6/1/2001 Decl. ¶¶ 3–4.) The Plaintiffs' claim that "[m]any of these corporations, such as Sundance and Brenner Holding, have no marketing policy" (Resp. at 16) is not supported by any documentation and is, therefore, not credited by the Court. The Court has considered all of the examples of instances when corporate formalities were allegedly not observed which are cited in the Plaintiffs' brief (Resp. at 11–16) and finds that, even taken together, the examples are simply too inconsequential to satisfy the *Beech* test. Because the Plaintiffs have been unable to offer any facts to refute the GREASE Defendants' colorable claims of separateness, the Court holds that Sundance and BB Promotion have not operated as mere departments of any of the GREASE Defendants.

### c. The Agency Test

In some cases, a court may exert jurisdiction over a foreign corporation based on in-state activities of that corporation's agent. As the New York Court of Appeals articulated in *Frummer v. Hilton Hotels International, Inc.*, the "significant and pivotal" question in the agency analysis is whether the purported agent "does all the business which [the foreign corporation] could do were it here by its own officials." 19 N.Y.2d 533, 537, 281 N.Y.S.2d 41, 227 N.E.2d 851 (1967). *See also Wiwa*, 226 F.3d at 95 ("Under well-established New York law, a court of New York may assert jurisdiction over a foreign corporation when it affiliates itself with a New York representative entity and that New York representative renders services on behalf of the foreign corporation that go beyond mere solicitation and are sufficiently important to the foreign entity that the corporation itself would perform equivalent services if no agent were available."); *Gelfand v. Tanner Motor Tours, Ltd.*, 385 F.2d 116, 121 (2d Cir.1967). Courts interpreting *Frummer* have been clear that a plaintiff is not required to introduce an official agency agreement or evidence of direct control by the defendant over the putative agent. *Wiwa*, 226 F.3d at 95 (citations omitted). However, "the agent must be primarily employed by the defendant and not engaged in similar services for other clients." *Id.* (citing to *Miller v. Surf Properties, Inc.*, 4 N.Y.2d 475, 481, 176 N.Y.S.2d 318, 151 N.E.2d 874 (1958)).

To some extent, the traditional laws of agency are broadened in the jurisdictional context. *See, e.g., Ontel Products, Inc. v. Project Strategies Corp.*, 899 F.Supp. 1144, 1147 (S.D.N.Y.1995) (holding that independent contractor can be agent for jurisdictional purposes). However, courts are still interested in the degree to which the purported agent has the authority to bind the parent organization. *See Rolls–Royce Motors, Inc. v. Charles Schmitt & Co.*, 657 F.Supp. 1040, 1048 (S.D.N.Y.1987). *Cf. Jayne*, 502 F.Supp. at 856. The Plaintiffs' reading of the *Frummer* test (Resp. at 18) focuses too closely on the nature of the tasks being performed by the alleged agent and ignores the degree to which *Frummer*'s holding speaks both to the *importance* of the task being assigned to the New York entity and the *degree of responsibility* that is entrusted. As the Defendants explain, "[w]here the New York entity is unable to contractually bind the foreign defendant in New York, the New York entity is 'unable to do all business [the out-of-state defendant] could do' were it in New York." (Reply at 12.) *See Sedig v. Okemo Mountain*, 204 A.D.2d 709,

612 N.Y.S.2d 643, 644 (2d Dep't 1994) ("There is no merit to the plaintiff's claim that an agency relationship exists between the defendant and the New York ski shops ... because there is no evidence that the shops have authority to contractually bind the defendant and thus serve as its agents for jurisdictional purposes.").

It is undisputed that Sundance organized New York auditions for GREASE GmbH in 1997 and that, in conjunction with negotiations for "Chicago," Sundance assisted GREASE GmbH by retaining an attorney. However, the Defendants have indicated that these were arms-length transactions and that Sundance was reimbursed (and paid a fee). There is no evidence that Sundance participated in any of the hiring or casting decisions or in any other way was in a position to bind GREASE GmbH. There is, therefore, no basis for treating Sundance as an agent of GREASE GmbH and, thus, no ground for exercising general jurisdiction over GREASE GmbH. *See Insurance Co. of Penn. v. Centaur Ins. Co.*, 590 F.Supp. 1187, 1188 (S.D.N.Y.1984) ("The mere existence of a business relationship with entities within the forum state is insufficient to establish presence."). Because the Court does not have jurisdiction over GREASE GmbH, the Plaintiffs' argument that the Court could exert jurisdiction over Brenner and Krauth based on its jurisdiction over GREASE GmbH (Resp. at 19) is moot. Even if the Court were to find that Sundance acted as an agent for jurisdictional purposes for BB Promotion, the Court is not persuaded the Defendants Brenner and Krauth "so dominated BB and Sundance" (Resp. at 20) that those companies were Brenner and Krauth's

agents. Here again, the Plaintiffs offer no factual support for this allegation.

It is clear that the relationship between Roseanne Kirk and Brenner Holding was more formal and continuous than that between Sundance and GREASE GmbH. The Plaintiffs point to Kirk's contract which specified that she would "perform all duties of consultancy, organization and representation of producer's activities in New York City for the U.S.A. and to maintain a telephone and fax connection for the convenience of the parties." [12] (Schwartz Cert.App. M.) Here again, the agency analysis must be focused on the importance (to Brenner Holding) of the in-state work that Kirk was doing and the amount of responsibility she was assigned.

To establish that Kirk was an agent of Brenner Holding, the Plaintiffs must first show that the business she conducted in New York, on behalf of Brenner Holding, was a "main part" of its "corporate function." *Benware v. Acme Chemical Co.*, 284 A.D. 760, 135 N.Y.S.2d 207, 209 (N.Y.App.Div.1954). *See also Bulova*, 508 F.Supp. at 1334 (explaining that for both agency and mere department tests, "the significance of the New York business to the defendant's overall activities" must be weighed); *Dogan*, 507 F.Supp. at 258–59 (inquiring into the importance of the in-state services being performed by the alleged agent). Brenner Holding's principal business is the production of plays in Europe. Kirk's in-state activities in connection with Harlem Gospel Singers, a show that was not performed in New York, cannot be the basis of jurisdiction over Brenner Holding. *Cf. Mantello*, 947 F.Supp. at 100. Thus, although it is not disputed that Kirk herself was present in New York, her

12. Plaintiffs draw attention to the use of the phrase "the parties" in this contract (Resp. at 21), suggesting that it is some unidentified group of interested entities. As is outlined at the top of the contract, a reference to "the parties" includes Brenner, on behalf of Brenner Holding, and Kirk. (Schwartz Cert.App. M.)

discrete in-state activities, to further a show being performed overseas, simply cannot suffice to establish that Brenner Holding was "doing business" in New York through Roseanne Kirk.

Even if the Court were persuaded that the services performed by Kirk in New York were an important enough part of Brenner Holding's general corporate activity, the Defendants have repeatedly emphasized that Kirk was never authorized to enter into contracts for Brenner Holding (or any of the GREASE Defendants). The fact that Kirk was not in a position to bind Brenner Holding significantly limits the extent to which she accomplished "all the business" which Brenner Holding could do if it were present in New York. *Frummer*, 19 N.Y.2d at 537, 281 N.Y.S.2d 41, 227 N.E.2d 851. *See also Rolls–Royce*, 657 F.Supp. at 1048; *Sedig*, 612 N.Y.S.2d at 644. Finally, the fact that Kirk's activities in New York were completely unrelated to the matters raised in the complaint, even in the general jurisdiction context, certainly does not strengthen the Plaintiffs' position. *See Bulova*, 508 F.Supp. at 1344 ("[I]n practice, [general jurisdiction] cases do reflect judicial weighing of the local agent's participation in the actions surrounding the complaint as a factor strengthening the doing business basis of jurisdiction."). Because the Court does not have jurisdiction over GREASE GmbH or Brenner Holding, the Plaintiffs' remaining allegation, that these corporations were the agents of Brenner and Krauth, does not need to be decided.

*2. Specific Jurisdiction*

The New York long arm statute provides for jurisdiction over a nonresident defendant where the cause of action arises from the defendant's transaction of business in New York. CPLR § 302(a)(1) ("As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, who in person or through an agent ... transacts any business within the state or contracts anywhere to supply goods or services in the state; ...."). The Plaintiffs must show both that the Defendants transacted business in the state and that the Plaintiffs' cause of action arose from that business. It is well-settled that the relationship between the claim and the in-state transaction must be "direct." *Hoffritz*, 763 F.2d at 61; *Indiana Black Expo*, 81 F.Supp.2d at 501 ("A claim arises out of a party's transaction of business when there is a 'substantial nexus' between the transaction of business and the cause of action sued upon."). Under New York law, the Court must consider the "totality of the circumstances" in determining whether the defendant transacted business in the state. *Yurman Designs*, 41 F.Supp.2d at 458–59.

The Plaintiffs claim that the Court has specific jurisdiction over Brenner, Krauth and GREASE GmbH, because of several New York transactions which Plaintiffs allege are related to the copyright infringement which is the substance of the suit. (The Plaintiffs do not allege that the Court has specific jurisdiction over Brenner Holding.) The transactions include: auditions for "GREASE" which were conducted in New York; the purchase of $32,000 of supplies from New York stores; hiring a New York musical coordinator; hiring a Musical Director from Connecticut (who had a New York agent); and meeting and thereafter corresponding with Ronald Taft, the Plaintiffs' attorney, about the possibility of licensing the play directly from the Plaintiffs beginning in 1999. The GREASE Defendants continue to maintain that there is no direct nexus between their in-state activity and the copyright infringement claim, which is based on the alleged

use of an improper translation of the musical in Germany, alterations to the text and music of a German production of the musical, performance of the songs in English in Germany and performance of the musical after August 11, 1998.

■■■ Although the Plaintiffs point to numerous transactions which relate generally to the Defendant's European production of "GREASE," these transactions are not directly tied to the Plaintiffs' claim. The Plaintiffs have introduced no evidence that any of the decisions relating to the alleged infringement were made in New York or even by personnel hired in New York. For that reason, the facts of this case differ significantly from those presented in *Davis v. Costa–Gavras,* 595 F.Supp. 982 (S.D.N.Y.1984), where the court determined that the defendant was subject to specific jurisdiction. In *Davis,* the defendant, who was the author and producer of an allegedly defamatory screenplay, conducted significant research for the screenplay in New York, attended multiple screenings of the film in New York and engaged in publicity activities in New York. (He also had a bank account in New York, among other general jurisdiction contacts.) *Id.* at 985. By contrast, the connection between New York state auditions or wig purchases, for example, and the copyright infringement alleged by the Plaintiffs is much more attenuated. These types of transactions are too far removed from the crux of the lawsuit to satisfy the § 302(a)(1) test. *See Mantello,* 947 F.Supp. at 100 (finding that auditions held in New York (and hiring that resulted) did not relate directly to the injury suffered by the plaintiffs); *Viacom Int'l, Inc. v. Melvin Simon Prods., Inc.,* 774 F.Supp. 858, 863 (S.D.N.Y.1991) (holding that company president's trips to New York to seek financing, to hold casting calls and to attend screening were only indirectly related to plaintiff's claim and therefore could not be the basis for specific jurisdiction under the New York long arm statute). In light of these straightforward precedents, the Court rejects the Plaintiffs' argument that the GREASE Defendants should be subject to "arising from" jurisdiction because they "assembled the necessary creative elements" in New York for an infringing production abroad. (Letter from H. Schwartz to the Court of 8/28/2001, at 2.)

Plaintiffs also assert that the Defendants' negotiations with Plaintiffs' attorney, Ronald Taft, are sufficiently related to the gravamen of the lawsuit to subject the Defendants to specific jurisdiction. The Plaintiffs and Defendants have somewhat contradictory accounts of the meeting (including on what precise date it occurred). For purposes of this motion, however, the Court accepts as true the version of events recounted by Ronald Taft. Taft claims that he was first alerted to the likelihood of a Felix Bloch breach during his meeting with Brenner and Krauth because the Defendants either directly or indirectly made him aware that unauthorized translations and English songs were being used in German performances of "GREASE." The fact that the Plaintiffs may have discovered the alleged breach as a result of this meeting does not provide a basis for jurisdiction over the Defendants, because the alleged Felix Bloch breach can, in no way, be said to have arisen from that meeting. *See Bozell,* 2000 WL 1523282 at *6–7, 2000 U.S. Dist. LEXIS 15088 at *19–22 (holding, in breach of advertising contract case, that two meetings in New York to discuss advertising strategy were "mere 'links in the chain of events leading to the claims for which relief is sought'"). *See also Pneuma–Flo Systems, Inc. v. Universal Machinery Corp.,* 454 F.Supp. 858, 866 (S.D.N.Y.1978) ("[I]n each of the cases

where jurisdiction over a non-resident has been upheld due to the visits of its officials, those meetings were for purposes essential to the formation or continuance of the contract which gave rise to the litigation."). The Plaintiffs also argue that their claim of copyright infringement against the GREASE Defendants is grounded in the fact that the GREASE Defendants became aware of the Felix Bloch breach (and, according to the Plaintiffs, its implications for their continued performance of the show) as a result of their meeting and subsequent negotiations with Taft. While the Defendants' knowledge may be relevant to the copyright infringement claim, the fact that the Defendants may have learned of a Felix Bloch breach as an eventual consequence of their single meeting in New York with Taft still does not establish a close enough connection between the commission of the alleged copyright infringement and the New York activities. *See McKee Electric Co. v. Rauland–Borg Corp.*, 20 N.Y.2d 377, 380–83, 283 N.Y.S.2d 34, 229 N.E.2d 604 (1967) (holding that Defendant's visit to New York to inquire into friction related to contract did not qualify as transacting business in suit for breach of that contract). The Court finds that the Plaintiffs have not established that any of the De-

fendants were "transacting business" in New York under § 302(a)(1).

Therefore, the Court finds that personal jurisdiction is lacking as to all of the GREASE Defendants and their motion to dismiss is granted. As a result, it is unnecessary to consider the GREASE Defendants' *forum non conveniens* motion. The Court turns now to the motion of Defendant Felix Bloch.[13]

### B. Forum Non Conveniens—Felix Bloch

At the outset of their *forum non conveniens* response, Plaintiffs suggest that Felix Bloch's failure to raise a *forum non conveniens* objection prior to answering makes it ineligible for a *forum non conveniens* dismissal. No cases are cited in support of this point and no elaboration is provided. The crux of the Plaintiffs' *forum non conveniens* argument is directed at the GREASE Defendants and the only additional mention of Felix Bloch appears in the final footnote of the response. In that footnote, Plaintiffs assert that Felix Bloch's motion to dismiss for *forum non conveniens* should be denied for the same reasons they have articulated in response to the *forum non conveniens* motion of the GREASE Defendants. (Resp. at 37 n. 4.)

---

13. During oral argument on July 17, 2001, Felix Bloch suggested that the Court ought to dispense with the *forum non conveniens* question for all the Defendants before addressing the jurisdictional claims raised by the GREASE Defendants. (Tr. at 6.) The Court opted not to do that, in part because the Court's decision as to jurisdiction over the GREASE Defendants might impact the *forum non conveniens* analysis as to Felix Bloch. In addition, a number of cases have suggested that consideration of *forum non conveniens* should not precede the resolution of jurisdictional questions. *See Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 504, 67 S.Ct. 839, 91 L.Ed. 1055 (1947) ("Indeed the doctrine of forum

non conveniens can never apply if there is absence of jurisdiction or mistake of venue."); *Interbrew, S.A. v. Edperbrascan Corp.*, 23 F.Supp.2d 425, 427 (S.D.N.Y.1998) ("Before a court can consider a forum non conveniens motion, it must first determine whether it has jurisdiction over the case and the parties."); *Monsanto Int'l Sales Co., Inc. v. Hanjin Container Lines, Ltd.*, 1991 WL 210951, at *1, 1991 U.S. Dist. LEXIS 14189, at * 3 (S.D.N.Y. October 4, 1991) (modifying prior order after concluding that personal jurisdiction issue should have been resolved prior to consideration of forum non conveniens motion) *aff'd without opinion*, 962 F.2d 4 (2d Cir.1992).

The Court has found no cases which suggest that a motion to dismiss on *forum non conveniens* grounds must be made prior to a responsive pleading.[14] In fact, the caselaw seems to be clear that *forum non conveniens* motions are not governed by the same time constraints imposed by Rule 12(h) of the Federal Rules of Civil Procedure on personal jurisdiction and venue motions. *See Snam Progetti S.P.A. v. Lauro Lines,* 387 F.Supp. 322, (S.D.N.Y. 1974) ("The Court declines to accept the argument that the waiver provisions of Rule 12(h) must govern [a *forum non conveniens*] motion."); *Breindel & Ferstendig v. Faber,* 1996 WL 413727, at *3 n. 1, 1996 U.S. Dist. LEXIS 10432, at *7 n. 1 (S.D.N.Y. July 22, 1996) (explaining that defendant's delay in bringing *forum non conveniens* motion would not constitute waiver, but would be factored against defendant in the Court's evaluation of whether the forum was convenient).

There are two parts of the *forum non conveniens* analysis. First, a court must determine whether there is an adequate alternative forum with jurisdiction to hear the case. *Wiwa,* 226 F.3d at 100; *Peregrine Myanmar Ltd. v. Segal,* 89 F.3d 41, 46 (2d Cir.1996). *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 506, 67 S.Ct. 839, 91 L.Ed. 1055 (1947) (explaining that the doctrine of *forum non conveniens* "presupposes at least two forums in which the defendant is amenable to process" and "furnishes criteria for choice between them"). In this case, there is no dispute that German courts would provide an "adequate alternative forum." (*See* Satnick Decl. ¶ 9 (noting that Felix Block "is subject to the jurisdiction of the German courts").)

With that established, the Court must engage in a balancing process, weighing the private interests of the parties and the public interests involved. *Id.* Felix Bloch bears the burden of demonstrating that the public and private interests "tilt[ ] strongly in favor of a trial in the foreign forum.'" *Wiwa,* 226 F.3d at 100 (citations omitted). The burden on the defendant in the *forum non conveniens* context is deliberately heavy because "the plaintiff's choice of forum should rarely be disturbed." *Gilbert,* 330 U.S. at 508, 67 S.Ct. 839. *See also Peregrine Myanmar Ltd. v. Segal,* 89 F.3d 41, 46 (2d Cir.1996). In 1947, the Supreme Court, in *Gilbert,* identified the public and private interests that should factor into a court's *forum non conveniens* analysis. 330 U.S. at 508–09, 67 S.Ct. 839. Thirty-four years later, the Court summarized these factors in *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981):

The factors pertaining to the private interests of the litigants included the 'relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining the attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive.' The public factors bearing on the question included the administrative difficulties flowing from court congestion; the 'local interest in having localized controversies decided at home'; the interest in having

---

14. The Court need not engage in an analysis of what law applies to the *forum non conveniens* analysis because state and federal law apparently do not conflict. *See Munsell v. La Brasserie Molson Du Quebec Limitee,* 618 F.Supp. 1383, 1387 (E.D.N.Y.1985) (explaining that in *Gilbert,* the "Supreme Court avoided deciding which law controlled by declaring that New York and federal law did not differ") (citations omitted). *See also Alcoa Steamship Co., Inc. v. M/V Nordic Regent,* 654 F.2d 147 (2d Cir.1980).

743

the trial of a diversity case in a forum that is at home with the law that must govern the action; the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law; and the unfairness of burdening citizens in an unrelated forum with jury duty.

*Piper*, 454 U.S. at 241 n. 6, 102 S.Ct. 252 (quoting *Gilbert*, 330 U.S. at 508–09, 67 S.Ct. 839). *See also Manu International, S.A. v. Avon Products, Inc.*, 641 F.2d 62, 65 (2d Cir.1981).

■■■ Before proceeding to the balancing process, the Court wishes to address one issue regarding the deference that should be afforded to a plaintiff's choice of forum. Several times in their papers, the GREASE Defendants suggested that the Plaintiffs' choice of New York as the forum should be accorded less deference because neither Plaintiff is from New York. (*See, e.g.*, Brenner 6/1/2001 Decl. ¶ 10.c.) As the Second Circuit has recently clarified, "the 'home forum' of an American citizen for forum non conveniens purposes is any 'United States court.' " *Wiwa* 226 F.3d at 103 (quoting *Guidi v. Inter–Continental Hotels Corp.*, 224 F.3d 142, 146 (2d Cir. 2000)) ("In this case, Plaintiffs argue—and we agree-that their 'home forum' as American citizens is a United States court, such as the courts of the Southern District of New York."). Thus, the fact that the Plaintiffs are not New York residents should afford their choice of a New York forum no diminished deference in the *forum non conveniens* analysis.

■■■ The Defendant makes several arguments in favor of dismissal, most of which focus on private interest factors. Defendant Felix Bloch is located in Germany and asserts that the cost of transporting its employee-witnesses who are familiar with the case to New York for trial would be unduly burdensome. (Satnick Decl. ¶ 5.) (The Defendant's employees are

subject to the subpoena power of the court. *See Update Art, Inc. v. Maariv Israel Newspaper, Inc.*, 635 F.Supp. 228, 233 (S.D.N.Y.1986).) In addition, Felix Bloch identifies a number of non-party witnesses, who reside and work in Germany. (*Id.*) These persons are former employees or associates of the company who have knowledge of the relevant facts of the case. (Satnick Decl. ¶ 5.) Felix Bloch claims that because these witnesses would "unlikely be willing to travel to New York" and because each is beyond the subpoena power of the Court, their testimony would have to be sought pursuant to the Hague Convention, an allegedly costly and burdensome process. (*Id.* ¶ 6.) It is worth noting here that Felix Block appears only to *surmise* that these non-party witnesses will be unwilling to testify. As the Second Circuit has suggested, the unavailability of compulsory process is a less compelling factor where a defendant has not claimed that its potential witnesses would be unwilling to testify. *See Peregrine Myanmar Ltd. v. Segal*, 89 F.3d 41, 47 (2d Cir.1996).

In addition, Felix Bloch asserts that its witnesses speak German as their principal language and interpreters would therefore be necessary if the trial is held in New York. (Satnick Decl. ¶ 8.) Likewise, the Defendant claims that its records are located in Germany and that the majority of the documents and records at issue are in German and would have to be translated for a trial in the United States. (Satnick Decl. ¶ 8.) It is clear that translation and interpretation expenses would increase the inefficiency, for the Defendant, of litigating in the United States. *See Jauss v. Lehman Brothers, Inc.*, 1995 WL 4023, *3 (S.D.N.Y. 94 Civ. 2921, Jan. 5, 1995).

At the same time, a dismissal on *forum non conveniens* grounds would seem merely to shift these inconveniences to the Plaintiffs in this case, who do not speak

German, who do not reside in Germany and whose primary witness and other documentary proof are all in New York. (Resp. at 34.) Ultimately, the need to translate documents or to provide interpreters "is not a hardship of sufficient magnitude to justify dismissal." *Update Art,* 635 F.Supp. at 233. Likewise, the Court is persuaded that the burden of transporting witnesses or documents which are located overseas has been lessened "in light of the increased speed and ease of travel and communication." *Manu International, S.A. v. Avon Products, Inc.,* 641 F.2d 62, 65 (2d Cir.1981). *See also Calavo Growers of Cal. v. Generali Belgium,* 632 F.2d 963, 969 (2d Cir.1980) (Newman, J., concurring) ("It will often be quicker and less expensive to transfer a witness or a document than to transfer a lawsuit. Jet travel and satellite communications have significantly altered the meaning of 'non conveniens.' ").

The sole non-party witness identified by the Plaintiffs is Ronald Taft. The Court accepts the Plaintiffs' contention that Taft would be an important witness for their case against Felix Bloch because, as the authors' attorney for matters relating to the copyright, he has knowledge of certain facts in the case. (Resp. at 34.) In addition, Plaintiffs indicate that Taft is in possession of numerous documents which are relevant to the case. (*Id.*)

The fact that, pursuant to this decision, the GREASE Defendants are not subject to personal jurisdiction in New York is, perhaps, the factor that "tilts" most strongly toward Germany. Certainly, an interest in judicial economy and in facilitating a complete resolution for all the parties in a single suit makes Germany an appealing forum. However, these interests are simply insufficient to justify interfering with the Plaintiffs' choice of this forum.

It is quickly apparent that none of the public interest concerns will function as a deciding factor in this *forum non conveniens* analysis. The Court can comfortably accommodate this case on its docket, so administrative adjustments are not a compelling concern. As to the preference, articulated in *Gilbert* for resolving local controversies at home, 330 U.S. at 509, 67 S.Ct. 839, neither Germany nor New York would seem to have a more legitimate claim to this case. Both fora are likely interested in the outcome.

The Defendant maintains that the Plaintiffs' claim is governed by German copyright law and would therefore require the testimony of German copyright law experts. (Satnick Decl. ¶ 7.) Plaintiffs' complaint and first amended complaint contend that the Defendants violated *German* copyright laws. (Compl. ¶ 71; Am. Compl. ¶ 71.) Plaintiffs' brief in opposition to Defendants' renewed motion to dismiss, however, alleges that United States copyright law also applies. (Resp. at 36–37.) It would seem that both United States and German laws will be applied to the suit against Felix Bloch because of the choice of law clause (providing for the application of New York State laws) that was a part of the original licensing agreement. (*See* Am. Compl. ¶ 16.) For that reason, the Court finds that, in this case, the law to be applied to the dispute is not particularly helpful in distinguishing between Germany and the United States as the more convenient forum.

The fact that Felix Bloch contracted with United States citizens for the rights to a license, included a choice of New York law clause in the agreement (which was executed in New York), and neglected to move for a *forum non conveniens* dismissal until two and a half years after the action commenced, further weakens its claim of inconvenience. Although the

Court appreciates that there are significant burdens associated with litigating before a foreign court, the Defendant's motion to dismiss for *forum non conveniens* is simply not compelling enough to warrant disturbing the Plaintiffs' choice of New York as a forum.

## C. Addition of Sundance Productions as a Defendant

Finally, the Plaintiffs move the Court for leave to amend their pleadings to add Sundance as a defendant. This motion is contested by Defendant Michael Brenner, the sole shareholder of Sundance, on the ground that the Plaintiffs do not have a good faith basis for so amending the complaint. It is Brenner's view that Sundance cannot be held liable for any of the allegedly infringing acts of the GREASE Defendants. (Reply at 20.) Plaintiffs offer no explanation for this motion and have submitted no supporting papers for the addition of Sundance as a party.

Under Rule 15(a) of the Federal Rules of Civil Procedure, the Plaintiffs are permitted to amend their pleading "once as a matter of course at any time before a responsive pleading is served ..." Because the Plaintiffs have already amended their pleading, they may amend the complaint to add Sundance "only by leave of court." Fed.R.Civ.P. 15(a). The decision to grant a party leave to amend their pleading is within the discretion of the trial court, but the rule advises that "leave shall be freely given when justice so requires." Fed. R.Civ.P. 15(a). In other words, as the Supreme Court made clear in *Foman v.*

*Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962), a court should grant leave to amend unless the circumstances of the case warrant a denial. The *Foman* Court enumerates a series of circumstances in which a court need not permit an amendment, including the "futility of the amendment." *Id.* at 182, 83 S.Ct. 227. Without the benefit of any explanation by the Plaintiffs, the Court is unable to see how Sundance can be connected to the Plaintiffs' cause of action. For that reason, the Court agrees with Defendant Brenner that the amendment of the complaint to add Sundance as a party at this point would be futile.

### III. Conclusion

For the foregoing reasons, the GREASE Defendants' motion to dismiss for lack of personal jurisdiction is granted; Defendant Felix Bloch's motion to dismiss for *forum non conveniens* is denied; and the Plaintiffs' motion for leave to amend the complaint is also denied.

The Court will conference this case in early October 2001 to set a schedule for proceeding. Chambers staff will communicate with counsel to set a specific date and time.

SO ORDERED.