United States Court of Appeals
Fifth Circuit

**F I L E D**

**June 11, 2003**

Charles R. Fulbruge III
Clerk

In the
# United States Court of Appeals
for the Fifth Circuit

———————

m 02-20166

———————

BP OIL INTERNATIONAL, LTD.,
AND
BP EXPLORATION & OIL, INC.,

Plaintiffs-Appellants,

VERSUS

EMPRESA ESTATAL PETROLEOS DE ECUADOR (PETROECUADOR), ET AL.,

Defendants,

EMPRESA ESTATAL PETROLEOS DE ECUADOR (PETROECUADOR)
AND
SAYBOLT, INC.,

Defendants-Appellees.

———————

Appeals from the United States District Court
for the Southern District of Texas

———————

Before SMITH and BARKSDALE, Circuit Judges, and FITZWATER,[*] District Judge.

JERRY E. SMITH, Circuit Judge:

Empresa Estatal Petroleos de Ecuador ("PetroEcuador") contracted with BP Oil International, Ltd. ("BP"), for the purchase and transport of gasoline from Texas to Ecuador. PetroEcuador refused to accept delivery, so BP sold the gasoline at a loss. BP appeals a summary judgment dismissing PetroEcuador and Saybolt, Inc. ("Saybolt"), the company responsible for testing the gasoline at the port of departure. We affirm in part, reverse in part, and remand.

## I.

PetroEcuador sent BP an invitation to bid for supplying 140,000 barrels of unleaded gasoline deliverable "CFR" to Ecuador. "CFR," which stands for "Cost and FReight," is one of thirteen International Commercial Terms ("Incoterms") designed to "provide a set of international rules for the interpretation of the most commonly used trade terms in foreign trade."[1] Incoterms are recognized through their incorporation into the Convention on Contracts for the International Sale of Goods ("CISG").[2] *St. Paul Guardian Ins. Co. v.*

---

[*] District Judge of the Northern District of Texas, sitting by designation.

[1] INTERNATIONAL CHAMBER OF COMMERCE, INCOTERMS 1990 (1990); *see also Nuovo Pignone, SpA v. Storman Asia M/V*, 310 F.3d 374, 380 n.5 (5th Cir. 2002).

[2] United Nations Convention on Contracts for the International Sale of Goods, Apr. 11, 1980, S. Treaty Doc. No. 98-9 (1983), 19 I.L.M. 668 (1980), reprinted at 15 U.S.C. app. (entered into (continued...)

*Neuromed Med. Sys. & Support*, *Gmbh*, 2002 U.S. Dist. LEXIS 5096, at *9-*10 (S.D.N.Y. Mar. 26, 2002).

BP responded favorably to the invitation, and PetroEcuador confirmed the sale on its contract form. The final agreement required that the oil be sent "CFR La Libertad-Ecuador." A separate provision, paragraph 10, states, "Jurisdiction: Laws of the Republic of Ecuador." The contract further specifies that the gasoline have a gum content of less than three milligrams per one hundred milliliters, to be determined at the port of departure. PetroEcuador appointed Saybolt, a company specializing in quality control services, to ensure this requirement was met.

To fulfill the contract, BP purchased gasoline from Shell Oil Company and, following testing by Saybolt, loaded it on board the M/T TIBER at Shell's Deer Park, Texas, refinery. The TIBER sailed to La Libertad, Ecuador, where the gasoline was again tested for gum content. On learning that the gum content now exceeded the contractual limit, PetroEcuador refused to accept delivery. Eventually, BP resold the gasoline to Shell at a loss of approximately two million dollars.

BP sued PetroEcuador for breach of contract and wrongful draw of a letter of guarantee. After PetroEcuador filed a notice of intent to apply foreign law pursuant to FED. R. CIV. P. 44.1, the district court applied Texas choice of law rules and determined that Ecuadorian law governed. BP argued that the term "CFR" demonstrated the parties' intent to pass the risk of loss to PetroEcuador once the goods were delivered on board the TIBER.

---

[2](...continued)
force Jan. 1, 1988).

The district court disagreed and held that under Ecuadorian law, the seller must deliver conforming goods to the agreed destination, in this case Ecuador. The court granted summary judgment for PetroEcuador.

BP also brought negligence and breach of contract claims against Saybolt, alleging that the company had improperly tested the gasoline.[1] Saybolt moved for summary judgment, asserting a limitation of liability defense and waiver of claims based on the terms of its service contract with BP. The court granted Saybolt's motion, holding that BP could not sue in tort, that BP was bound by the waiver provision, and that Saybolt did not take any action causing harm to BP. Pursuant to FED. R. CIV. P. 54(b), the court entered final judgment in favor of PetroEcuador and Saybolt.

II.

We review a summary judgment using the same standards as did the district court; thus our review is *de novo*. *Walton v. Alexander*, 44 F.3d 1297, 1301 (5th Cir. 1995) (en banc). Summary judgment is proper where "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). All inferences from the record must be construed in the light most favorable to the non-movant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986). "[O]nly when there is a choice of reasonable interpretation of the contract is there a material fact issue concerning the parties' intent that would preclude summary judgment." *Amoco Prod. Co. v. Tex.*

*Meridian Res. Exploration, Inc.*, 180 F.3d 664, 669 (5th Cir. 1999).

III.

BP and PetroEcuador dispute whether the domestic law of Ecuador or the CISG applies. After recognizing that federal courts sitting in diversity apply the choice of law rules of the state in which they sit, *Coghlan v. Wellcraft Marine Corp.*, 240 F.3d 449, 452 n.2 (5th Cir. 2001) (citation omitted), the district court applied Texas law, which enforces unambiguous choice of law provisions. *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 678 (Tex. 1990). Paragraph 10, which states "Jurisdiction: Laws of the Republic of Ecuador," purports to apply Ecuadorian law.[2] Based on an affidavit submitted by PetroEcuador's expert, Dr. Gustavo Romero, the court held that Ecuadorian law requires the seller to deliver conforming goods at the agreed destination, making summary judgment inappropriate for BP.

A.

Though the court correctly recognized that federal courts apply the choice of law rules of the state in which they sit, it overlooked its concurrent federal question jurisdiction that makes a conflict of laws analysis unnecessary.[3]

_____

[1] BP also filed an amended admiralty claim against the TIBER *in rem*, Tiber Shipping, L.L.C., and Rio Grande Transport *in personam*.

[2] We assume *arguendo* that the provision stating "Jurisdiction: Laws of the Republic of Ecuador" unambiguously conveys the intent to apply Ecuadorian law.

[3] *See* 28 U.S.C. § 1652 ("The laws of the several states, except where the Constitution or treaties of the United States or Acts of Congress otherwise require or provide, shall be regarded as rules of decision in civil actions in the courts of the United States, in cases where they apply."); *Resolution Trust Corp. v. Chapman*, 29 F.3d 1120, 1124 (7th Cir. 1994) ("What Illinois courts (continued...)

The general federal question jurisdiction statute grants subject matter jurisdiction over every civil action that arises, *inter alia*, under a treaty of the United States. 28 U.S.C. § 1331(a). The CISG, ratified by the Senate in 1986, creates a private right of action in federal court. *Delchi Carrier v. Rotorex Corp.*, 71 F.3d 1024, 1027-28 (2d Cir. 1995). The treaty applies to "contracts of sale of goods between parties whose places of business are in different States . . . [w]hen the States are Contracting States." CISG art. 1(1)(a). BP, an American corporation, and PetroEcuador, an Ecuadorian company, contracted for the sale of gasoline; the United States and Ecuador have ratified the CISG.[4]

As incorporated federal law, the CISG governs the dispute so long as the parties have not elected to exclude its application. CISG art. 6. PetroEcuador argues that the choice of law provision demonstrates the parties' intent to apply Ecuadorian domestic law instead of the CISG. We disagree.

A signatory's assent to the CISG necessarily incorporates the treaty as part of that nation's domestic law. BP's expert witness as to Ecuadorian law, Xavier Rosales-Kuri, observed that "the following source of *Ecuadorian law* would be applicable to the present case: (i) United Nations Convention on the International Sale of Goods . . . ."

PetroEcuador's expert did not disagree with this assessment.[5] Given that the CISG *is* Ecuadorian law, a choice of law provision designating Ecuadorian law merely confirms that the treaty governs the transaction.

Where parties seek to apply a signatory's domestic law in lieu of the CISG, they must affirmatively opt-out of the CISG. In *Asante Techs., Inc. v. PMC-Sierra, Inc.*, 164 F. Supp. 2d 1142, 1150 (N.D. Cal. 2001), the court held that a choice-of-law provision selecting British Columbia law did not, without more, "evince a clear intent to opt out of the CISG . . . . Defendant's choice of applicable law adopts the law of British Columbia, and it is undisputed that the CISG *is* the law of British Columbia."[6]

---

[5] Dr. Romero interprets article 4 of the Ecuador *Commercial Code* as "stat[ing] that mercantile customs (INCOTERMS) will be used to interpret commercial contract disputes when the law is 'silent' as to an issue in dispute. However, mercantile customs/INCOTERMS do not apply to the case at hand because the *Commercial Code* is not silent on the various contract issues this Agreement presents." This statement merely begs the question whether the *Commercial Code* of Ecuador applies in lieu of the CISG. Notably, article 4 of the *Commercial Code* was enacted in 1960, over thirty year before Ecuador ratified the CISG.

[6] *See also Ajax Tool Works, Inc. v. Can-Eng Manu. Ltd.*, 2003 U.S. Dist. LEXIS 1306, at *8 (N.D. Ill. Jan. 30, 2003) ("The parties' contract states that the 'agreement shall be governed by the laws of the Province of Ontario, Canada.' Obviously, this clause does not exclude the CISG."); *St. Paul Guardian Ins.*, 2002 U.S. Dist. LEXIS 5096, at *8 (stating that the CISG applies "[w]here parties, as here, designate a choice of law clause in their contractSSselecting the law of a Contracting State without expressly excluding application of

---

[3](...continued) would choose is, however, irrelevant. This is not a diversity case, where *Erie* would require the forum court to apply the whole law of the state, including its choice of law principles.").

[4] The United States Senate ratified the CISG in 1986. Ecuador ratified the CISG in 1993 without any rights or reservations. 15 U.S.C. app.

(continued...)

Similarly, because the CISG is the law of Ecuador, it governs this dispute. "[I]f the parties decide to exclude the Convention, it should be expressly excluded by language which states that it does not apply and also states what law shall govern the contract." RALPH H. FOLSOM, ET AL., INTERNATIONAL BUSINESS TRANSACTIONS 12 (2d ed. 2001). An affirmative opt-out requirement promotes uniformity and the observance of good faith in international trade, two principles that guide interpretation of the CISG. CISG art. 7(1).

### B.

The CISG incorporates Incoterms through article 9(2), which provides:

> The parties are considered, unless otherwise agreed, to have impliedly made applicable to their contract or its formation a usage of which the parties knew or ought to have known and which in international trade is widely known to, and regularly observed by, parties to contracts of the type involved in the particular trade concerned.

CISG art. 9(2). Even if the usage of Incoterms is not global, the fact that they are well known in international trade means that they are incorporated through article 9(2).[7]

PetroEcuador's invitation to bid for the procurement of 140,000 barrels of gasoline proposed "CFR" delivery. The final agreement, drafted by PetroEcuador, again specified that the gasoline be sent "CFR La Libertad-Ecuador" and that the cargo's gum content be tested pre-shipment.[8] Shipments designated "CFR" require the seller to pay the costs and freight to transport the goods to the delivery port, but pass title and risk of loss to the buyer once the goods "pass the ship's rail" at the port of shipment. The goods should be tested for conformity before the risk of loss passes to the buyer. FOLSOM, *supra,* at 41. In the event of subsequent damage or loss, the buyer generally must seek a remedy against the carrier or insurer. *In re Daewoo Int'l (Am.) Corp.*, 2001 U.S. Dist. LEXIS 19796, at \*8 (S.D.N.Y. Dec. 3, 2001).

In light of the parties' unambiguous use of the Incoterm "CFR," BP fulfilled its contractual obligations if the gasoline met the contract's qualitative specifications when it passed the ship's rail and risk transferred to PetroEcuador. CISG art. 36(1). Indeed, Saybolt's testing confirmed that the gasoline's gum content was adequate before departure from Texas. Nevertheless, in its opposition to

---

[6](...continued)
the CISG . . . . To hold otherwise would undermine the objectives of the Convention which Germany has agreed to uphold.").

[7] *See St. Paul Guardian Ins.*, 2002 U.S. Dist. LEXIS 5096, at \*9-\*10 (stating that "INCOTERMS are incorporated into the CISG through Article 9(2)"); RALPH H. FOLSOM, ET AL., *supra*, at 72 ("Incoterms could be made an implicit term of the contract as part of international custom. (continued...)

[7](...continued)
Courts in France and Germany have done so, and both treaties and the UNCITRAL Secretariat describe Incoterms as a widely-observed usage for commercial terms.").

[8] In accepting PetroEcuador's invitation, BP stated "CNF" as the condition of delivery. CNF was used in a previous version of Incoterms to specify "cost and freight" delivery. INTERNATIONAL CHAMBER OF COMMERCE, INCOTERMS 1980 (1980). In any event, the final agreement uses the term "CFR."

5

BP's motion for summary judgment, PetroEcuador contends that BP purchased the gasoline from Shell on an "as is" basis and thereafter failed to add sufficient gum inhibitor as a way to "cut corners."[9] In other words, the cargo contained a hidden defect.

Having appointed Saybolt to test the gasoline, PetroEcuador "ought to have discovered" the defect before the cargo left Texas. CISG art. 39(1).[10] Permitting PetroEcuador now to distance itself from Saybolt's test would negate the parties' selection of CFR delivery and would undermine the key role that reliance plays in international sales agreements. Nevertheless, BP could have breached the agreement if it provided goods that it "knew or could not have been unaware" were defective when they "passed over the ship's rail" and risk shifted to PetroEcuador. CISG art. 40.[11]

Therefore, there is a fact issue as to wheth-er BP knowingly provided gasoline with an excessive gum content. The district court should permit the parties to conduct discovery as to this issue only.

IV.

BP raises negligence and breach of contract claims against Saybolt, alleging that the company improperly tested the gasoline's gum content before shipment. These claims amount to indemnification for BP's losses suffered on account of PetroEcuador's refusal to accept delivery. Our conclusion that PetroEcuador is liable so long as BP did not knowingly provide deficient gasoline renders these claims moot. Summary judgment was therefore proper, though we need not review the district court's reasoning.

If PetroEcuador improperly refused CFR delivery, it is liable to BP for any consequential damages. In its claims against Saybolt, BP pleaded "in the alternative"; counsel also acknowledged, at oral argument, that beyond those damages stemming from PetroEcuador's refusal to accept delivery, BP has no collateral claims against Saybolt.[12] If Saybolt negligently misrepresented the gasoline's gum content, PetroEcuador (not BP) becomes the party with a potential claim.

---

[9] Under CISG article 36(1), "[t]he seller is liable in accordance with the contract . . . for any lack of conformity which exists at the time when the risk passes to the buyer, even though the lack of conformity becomes apparent only after that time."

[10] CISG article 39(1) states: "The buyer loses the right to rely on a lack of conformity of the goods if he does not give notice to the seller specifying the nature of the lack of conformity within a reasonable time after he has discovered it or ought to have discovered it."

[11] See also RALPH H. FOLSOM, ET AL., *supra*, at 41 ("Thus, the buyer is still able to recover for any nonconformity which becomes apparent long after delivery, but the buyer may have to prove that the defect was present at the delivery and was not caused by buyer's use, maintenance or protection of the goods.").

[12] Theoretically, BP might still have a collateral breach of contract claim against Saybolt for $3,913.96SSthe amount that it, PetroEcuador, and Shell were invoiced for Saybolt's inspection services. There is, however, no evidence in the record that BP ever paid its share of the invoice. Even so, the breach of contract claim set forth in BP's Third Amended Consolidating Claim alleges only that the contract requires Saybolt to "defend, indemnify and hold BP harmless from any damages." BP does not seek recovery of the inspection fee as part of its breach of contract claim.

Even if PetroEcuador is not liable because BP knowingly presented gasoline with an inadequate gum content, BP's claims drop out. BP alleges that Saybolt "negligently misrepresented the quality" of the gasoline before its loading in Texas; it also claims that Saybolt's improper testing was "a proximate cause of the gasoline to be refused by PetroEcuador and/or the gum content to increase which caused BP to suffer pecuniary loss." BP's claims depend on the fact that Saybolt misrepresented the quality of the gasoline. It goes without saying, however, that if BP knew that the gasoline was deficient, it could not have relied on Saybolt's report to its detriment.

The judgment dismissing PetroEcuador is REVERSED and REMANDED for proceedings consistent with this opinion. The judgment dismissing Saybolt is AFFIRMED.