**GENPHARM INC., Plaintiff**

v.

**PLIVA–LACHEMA A.S., Pliva d.d., Defendants.**

**No. 03–CV–2835 (ADS)(JO).**

United States District Court, E.D. New York.

March 19, 2005.

---

Rakoczy Molino Mazzochi LLP, by William A. Rakoczy, Esq., Paul J. Molino, Esq., Amy D. Brody, Esq., Of Counsel, Chicago, IL, for Plaintiff.

Lord, Bissell & Brook, LLP, by Gregory T. Casamento, Esq., Of Counsel, New York, NY, for Plaintiff.

Otterbourg, Steindler, Houston & Rosen, P.C., by Bernard Beitel, Esq., Lloyd M. Green, Esq., Of Counsel, New York, NY, for Defendants.

### MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

This is an action for breach of contract arising out of an alleged agreement between Genpharm Inc. ("Genpharm" or the "Plaintiff"), and Pliva–Lachema a.s. ("Pliva–Lachema"), to manufacture and supply Genpharm with a pharmaceutical ingredient used in the production of warfarin sodium tablets, the generic form of the anticoagulent drug marketed under the brand name "Coumadin." Currently pending before the Court are several motions by Pliva–Lachema and Pliva d.d. ("Pliva") (collectively, the "Defendants") to dismiss for lack of subject matter jurisdiction under Fed.R.Civ.P. 12(b)(1); lack of personal jurisdiction under Fed.R.Civ.P. 12(b)(2); or in the alternative forum non conveniens.

### BACKGROUND

#### I. The Parties.

Genpharm is a corporation located in Ontario, Canada, in the business of devel-

oping, marketing, and manufacturing generic pharmaceutical products. Pliva–Lachema, formerly known as Lachema before it was acquired by Pliva in 1999, is a corporation located in Brno, Czech Republic, allegedly in the business of developing, manufacturing, and selling active pharmaceutical ingredients ("API"). Pliva is a corporation organized under the laws of the Republic of Croatia with its principal place of business in Zagreb, Croatia. In 1999, two companies owned by Pliva acquired Pliva–Lachema: Pliva Krakow, S.A., a Polish corporation of which Pliva is the majority shareholder, and Pliva Pharma Holding, a Pliva wholly-owned subsidiary. Pliva alleges that Pliva–Lachema functions independently from Pliva and that it has no involvement in Pliva–Lachema's day-to-day operations.

According to the amended complaint, Pliva, like Pliva–Lachema, also develops, manufactures, and sells APIs to various pharmaceutical companies. One of those companies is Pliva USA, Inc. ("Pliva USA"), a New York corporation with its principal place of business in New York, New York. Aliapharm GMBH Frankfurt ("Aliapharm") is a German company that deals in various pharmaceuticals and chemicals produced in the Czech Republic, the Slovak Republic, Germany, and Italy. The complaint alleges that Aliapharm also acted as a distributor agent for the Defendants.

## II. Factual Background

In 1997, Genpharm began the preliminary development work necessary to prepare and submit an Abbreviated New Drug Application ("ANDA") to the Federal Drug Administration ("FDA") for generic warfarin sodium tablets to sell in the United States. As part of this development effort, Genpharm sought an API manufacturer to supply all of its developmental and future commercial warfarin API requirements. In February 1997,

Genpharm purchased its first developmental quantities of warfarin from Pliva–Lachema and discussed the possibility of the Defendants becoming Genpharm's sole supplier of warfarin API. Shortly thereafter, it is alleged that the companies understood that Genpharm would rely solely on the Defendants to obtain ANDA approval and that the Defendants would be Genpharm's sole supplier of warfarin API.

As part of the ANDA application process, a generic manufacturer must identify the API supplier who will be used to manufacture the finished drug product. Specifically, FDA regulations require an ANDA to include a Chemistry, Manufacturing and Controls ("CMC") section devoted to the manufacturing process and facilities used to make the API. The CMC section can either describe the process itself or, as in this case, incorporate by reference an API supplier's Drug Master File ("DMF"). A DMF explains in detail the equipment, manufacturing steps, raw materials, laboratory controls, and facilities used to make the API.

On or about November 19, 1999, Pliva–Lachema sent a "Letter of Access" to FDA for its warfarin DMF. In this letter, it is alleged that Pliva–Lachema authorized the FDA to refer to its DMF in support of any ANDA filed by Genpharm, and provided the assurance that it would provide advance notice to both Genpharm and the FDA of any change in the manufacturing site. At that time, Pliva–Lachema was manufacturing warfarin at its facility in Brno, Czech Republic. On May 23, 2000, Genpharm filed an ANDA application with the FDA identifying the Defendants as its sole manufacturer of the warfarin API.

The amended complaint alleges that on February 13, 2001, Genpharm and Pliva–Lachema entered into a written Manufacturer Agreement under which Pliva–

Lachema became Genpharm's only approved manufacturer of warfarin API. Under the terms of the agreement, Genpharm was to be notified in a timely fashion if there are any changes to the manufacturing site for the warfarin. Pliva–Lachema further agreed that written approval must be obtained from Genpharm prior to implementation of any changes to the manufacturing site. On February 20, 2001, Genpharm entered into a similar Distributor Agreement with Pliva–Lachema's alleged agent and representative, Aliapharm. This agreement also required that for any changes to the manufacturing site for warfarin, Genpharm was to receive timely notice prior to the implementation of such change.

On April 24, 2001, the defendants submit that Pliva–Lachema and Aliapharm entered into a contract for the sale of warfarin over the next five years. Genpharm is not a party to the contract but it identifies Genpharm as an "Aliapharm customer." The defendants contend that the contract, which is written in the Czech and German languages, specifically prohibits Pliva–Lachema from selling warfarin in the United States, Canada, and other designated countries. The contract also contains a dispute resolution provision agreeing to arbitration governed by the laws of the Czech Republic.

On February 27, 2002, the FDA informed Genpharm that an FDA inspection of Pliva–Lechema's warfarin manufacturing site in Brno, Czech Republic, was the only outstanding item necessary for FDA to complete its review and approval of Genpharm's ANDA. On March 7, 2002, FDA notified Pliva of the necessity for a preapproval inspection of its Brno facility. Pliva–Lachema refused to permit this inspection. On or about March 15, 2002, Pliva–Lachema notified the FDA and Genpharm that its manufacturing site for warfarin API was being transferred to Zagreb, Croatia.

On June 6, 2003, Genpharm brought this action alleging breach of contract. The Defendants moved to dismiss for lack of subject matter jurisdiction and personal jurisdiction. On December 15, 2003, Genpharm filed an amended complaint in lieu of a response. On January 26, 2004, the Defendants filed a second motion to dismiss the complaint for lack of personal jurisdiction. On August 9, 2004, the Defendants filed a third motion to dismiss for lack of subject matter and personal jurisdiction or in the alternative, for application of the forum non conveniens doctrine.

## DISCUSSION

### I. Subject Matter Jurisdiction

Federal courts are courts of limited jurisdiction and may only entertain disputes as specifically authorized by the Constitution or statute. *Kokkonen v. Guardian Life Ins. Co. of America,* 511 U.S. 375, 377, 114 S.Ct. 1673, 1675, 128 L.Ed.2d 391 (1994). Pursuant to statute, federal district courts "have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. The Plaintiff relies on an international treaty, known as the United Nations Convention on Contracts for the International Sale of Goods ("CISG") as a basis for this Court's subject matter jurisdiction. The Defendants contend that the subject matter jurisdiction of this Court is lacking because the instant dispute is outside the scope of the CISG. Thus, as an initial matter, the Court must determine whether this dispute falls within the realm of the CISG so as to invoke this Court's treaty jurisdiction.

The CISG is an international treaty that governs the formation of international sales contracts as well as the rights and

obligations of the parties. *See* CISG, Jan. 1, 1988, 15 U.S.C.App., art. I. Ratified by the Senate in 1986, the CISG is a self-executing treaty that creates a private right of action in federal court. *Delchi Carrier v. Rotorex Corp.*, 71 F.3d 1024, 1027–28 (2d Cir.1995); *see also BP Oil Intern., Ltd. v. Empresa Estatal Petoleos de Ecuador*, 332 F.3d 333, 336 (5th Cir. 2003). The Defendants argue that the contract at issue is not a contract for the sale of goods and lacks critical terms regarding price and quantity. The Court disagrees.

There are only a handful of American cases interpreting the CISG. In deciding issues under the treaty, courts generally look to its language and to the principles upon which it is based. *Delchi Carrier*, 71 F.3d at 1027–28; *see also Chicago Prime Packers, Inc. v. Northam Food Trading Co.*, 320 F.Supp.2d 702, 708–09 (N.D.Ill. 2004); *Usinor Industeel v. Leeco Steel Prods., Inc.*, 209 F.Supp.2d 880, 884 (N.D.Ill.2002) ("[F]ederal caselaw interpreting and applying the CISG is scant."). The CISG states:

(1) In the interpretation of this Convention, regard is to be had to its international character and to the need to promote uniformity in its application and the observance of good faith in international trade.

(2) Questions concerning matters governed by this Convention which are not expressly settled in it are to be settled in conformity with the general principles on which it is based or, in the absence of such principles, in conformity with the law applicable by virtue of the rules of private international law.

CISG, art. 7.

Article 3 of the CISG distinguishes sales of goods from contracts for services:

(1) Contracts for the supply of goods to be manufactured or produced are to be considered sales unless the party who order the goods undertakes to supply a substantial part of the materials necessary for such manufacture or production.

(2) This Convention does not apply to contracts in which the preponderant part of the obligations of the party who furnishes the goods consists in the supply of labour or other services.

CISG, art 3.

In a case with similar facts, another court in the Second Circuit applied the CISG in determining whether an implied-in-fact contract was created for the sale of clathrate, a raw material used in the production of warfarin. *Geneva Pharms. Tech. Corp. v. Barr Labs., Inc.*, 201 F.Supp.2d 236, 281 (S.D.N.Y.2002), *rev'd on other grounds*, 386 F.3d 485, 489 (2d Cir.2004). In that case, the plaintiff alleged that a contact existed because it purchased research and development quantities of clathrate; invested a substantial amount of money in developing warfarin based on the defendants raw material; and "relied on the reference letter provided by [the supplier] in connection with the ANDA for warfarin sodium that it submitted to the FDA." *Id.* at 284. The court in *Geneva Pharms* not only applied the CISG but also determined that an implied-in-fact contract existed between the parties. *Id.* at 284.

The instant dispute presents strikingly similar allegations. Genpharm alleges that it purchased research and development quantities of warfarin from Pliva–Lachema and invested money in developing warfarin while relying on Pliva–Lachema for a supply of the API. Most important, Genpharm alleges that it "relied on the reference letter provided by [Pliva–Lachema] in connection with the ANDA for warfarin sodium that it submitted to the FDA." *Id.* at 284. Therefore, it appears that the arrangement between the

parties should be analyzed under the CISG.

This result would also be appropriate if analyzed under the UCC. The Second Circuit has recognized that "[c]aselaw interpreting analogous provisions of Article 2 of the Uniform Commercial Code ('UCC'), may also inform a court where the language of the relevant CISG provisions tracks that of the UCC. However, UCC caselaw 'is not per se applicable.'" *Delchi Carrier*, 71 F.3d at 1028 (quoting *Orbisphere Corp. v. United States*, 726 F.Supp. 1344, 1355 (Ct. Int'l Trade 1989)).

Here, the Court finds that caselaw interpreting contract formation under Article 2 of the UCC is helpful. Courts look to the "essence" or main objective of the agreement when deciding whether an agreement is a contract for the sale of goods covered by the UCC. *Medinol Ltd. v. Boston Scientific Corp.*, 346 F.Supp.2d 575, 593 (S.D.N.Y.2004). "If the provision of services or rendition of other performance predominates and is not merely incidental or collateral to the sale of goods, then the contract will not be subject to" the UCC. *Dynamics Corp. of America v. International Harvester Co.*, 429 F.Supp. 341, 346 (S.D.N.Y.1977); *see also Triangle Underwriters, Inc. v. Honeywell, Inc.*, 604 F.2d 737 (2d Cir.1979); *Cary Oil Co. v. MG Ref. & Mktg., Inc.*, 90 F.Supp.2d 401 (S.D.N.Y. 2000).

There can be no question that the instant dispute involves an agreement to supply goods. Indeed, it is clear that the only reason Genpharm and the Defendants had any relationship at all was for the international sale of warfarin, which is undeniably a "good." In addition, it makes no difference whether the agreements may or may not contain price or quantity. The CISG expressly provides that it "governs only the formation of the contract of sale and the rights and obligations of the seller and buyer arising from such contract."

CISG, art 4. The applicability of the CISG is not restricted to contracts after formation or contracts containing definite prices or quantities. Therefore, this dispute falls within this Court's treaty jurisdiction, and this Court's subject matter jurisdiction.

## II. Personal Jurisdiction

### A. Legal Standard

In a motion to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(2) for lack of personal jurisdiction, the plaintiff bears the burden of demonstrating that the court has jurisdiction over the defendants. *See Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784 (2d Cir.1999); *Kernan v. Kurz–Hastings, Inc.*, 175 F.3d 236, 240 (2d Cir.1999) (citing *Metropolitan Life Ins. Co. v. Robertson–Ceco Corp.*, 84 F.3d 560, 566 (2d Cir.1996)). While the plaintiff will ultimately have to prove the existence of personal jurisdiction over the defendant by a preponderance of evidence, prior to discovery, a plaintiff may defeat such a motion with legally sufficient allegations of jurisdiction that are pleaded in good faith. *See Jazini v. Nissan Motor Co., Ltd.*, 148 F.3d 181, 184 (2d Cir.1998).

Motions to dismiss under 12(b)(2) test the plaintiff's theory of jurisdiction and test the facts supporting the jurisdictional theory. *See Credit Lyonnais Sec. (USA), Inc. v. Alcantara*, 183 F.3d 151, 153 (2d Cir.1999). To survive such a motion to dismiss, the plaintiff is only required to make a prima facie showing of jurisdiction, including an averment of facts that, if credited by the ultimate trier of fact, sufficiently establish jurisdiction over the defendant. *See Kernan*, 175 F.3d at 240; *Bank Brussels Lambert*, 171 F.3d at 784.

In reaching a decision as to whether jurisdiction is appropriate, the Court need only determine whether the facts alleged

by the plaintiff, if true, are sufficient to establish jurisdiction. *See Credit Lyonnais Sec., Inc.,* 183 F.3d at 153. No evidentiary hearing or factual determination is necessary for this purpose. *See id.* When considering various affidavits and sworn declarations, the Court must construe them in the "light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor, notwithstanding a controverting presentation by the moving party." *A.I. Trade Finance, Inc. v. Petra Bank,* 989 F.2d 76, 79–80 (2d Cir.1993).

Genpharm's theory of how this Court has jurisdiction over the foreign corporations is three phased. First, Genpharm alleges that this Court has personal jurisdiction over Pliva because it is engaged in a continuous and systematic course of business in New York. Second, Genpharm argues that Pliva USA is an agent of Pliva in New York. Further, Genpharm argues that Pliva–Lachema is subject to personal jurisdiction as the alter-ego of Pliva. The Defendants argue that this court lacks "general" jurisdiction over Pliva and that both Pliva–Lachema and Pliva USA are separate corporate entities.

### B. Applicable Law

In federal question cases involving defendants that reside outside the forum state, the courts look to the forum state's personal jurisdiction rules, unless the applicable federal statute provides for nationwide service of process. *See Sunward Elecs., Inc. v. McDonald,* 362 F.3d 17, 22 (2d Cir.2004). The CISG contains no provisions on the service of process or other jurisdictional requirements. Under the Federal Rules of Civil Procedure, a court may exercise jurisdiction over any defendant "who could be subjected to the jurisdiction of a court of general jurisdiction in the state in which the district court is located . . . ." Fed.R.Civ.P. 4(k)(1)(a). As such, the Court must look to New York's personal jurisdiction statutes: New York

CPLR § 301, governing general jurisdiction; and CPLR § 302, governing specific or long-arm jurisdiction. If there is jurisdiction under New York law, then the Court must evaluate whether the exercise of that jurisdiction comports with the Due Process Clause of the Fifth Amendment. *See Bensusan Rest. Corp. v. King,* 126 F.3d 25, 27 (2d Cir.1997).

■ Under New York law, the predicate for jurisdiction over a foreign corporation is the fact that it is doing business in the state and has thus created a constructive presence over which a New York court can exert jurisdiction. *Flick v. Stewart–Warner Corp.,* 76 N.Y.2d 50, 556 N.Y.S.2d 510, 555 N.E.2d 907 (1990). New York CPLR § 301 authorizes the general exercise of personal jurisdiction over a non-resident defendant if it is "engaged in such a continuous and systematic course of doing business here as to warrant a finding of its presence in this jurisdiction." *J.L.B. Equities, Inc. v. Ocwen Fin. Corp.,* 131 F.Supp.2d 544, 547–48 (S.D.N.Y.2001) (citations omitted). "Occasional or casual business in New York will not meet the requirements of Section 301." *See Fashion Fragrance & Cosmetics v. Croddick,* No. 02 Civ. 6294, 2003 WL 342273, at *2, 2003 U.S. Dist. LEXIS 2220, at *7 (S.D.N.Y. Feb.13, 2003).

"The test for 'doing business' is a 'simple [and] pragmatic one,' which varies in its application depending on the particular facts of each case . . . ." *See Landoil Resources Corp. v. Alexander & Alexander Servs., Inc.,* 77 N.Y.2d 28, 33, 565 N.E.2d 488, 563 N.Y.S.2d 739 (1990). To determine whether a defendant "does business" in New York, courts have focused on the following factors: "the existence of an office in New York; the solicitation of business in the state; the presence of bank accounts and other property in the state; and the presence of employees of the for-

eign defendant in the state." *Hoffritz for Cutlery, Inc. v. Amajac, Ltd.,* 763 F.2d 55, 58 (2d Cir.1985).

It is undisputed that Pliva maintains no office in New York, has no bank account in New York, and does not have employees in New York. However, Genpharm alleges that Pliva is engaged in a continuous, systematic, and substantial course of business in New York by: (1) selling and shipping pharmaceutical products to this forum; (2) obtaining substantial revenue from the products it sells in New York; (3) entering into multiple contracts for the sale of its products within New York; (4) distributing its products into the stream of commerce in New York. In addition, Genpharm alleges that Pliva has engaged in substantial solicitation of business in New York and promoted its pharmaceuticals. The Defendants assert in their affidavits that from 2001 to 2003, Pliva shipped, on a "CIP" basis, that is with title passing in Croatia, approximately $5,830,000 worth of APIs to an independent distributor in New York. The Court assumes this figure does not include the products it shipped to its wholly-owned subsidiary, Pliva USA.

Courts have consistently held that the mere sale of foreign manufacturer's goods in New York, by itself, is not sufficient for personal jurisdiction. *See Delagi v. Volkswagenwerk AG of Wolfsburg,* 29 N.Y.2d 426, 433, 278 N.E.2d 895, 328 N.Y.S.2d 653 (1972) ("[M]ere sales of a manufacturers product in New York, however substantial, have never made the foreign corporation manufacturer amenable to suit in this jurisdiction."). Likewise, it is settled that the mere solicitation of business alone does not confer jurisdiction over a defendant. *Landoil Resources Corp. v. Alexander & Alexander Services, Inc.,* 918 F.2d 1039, 1043 (2d Cir.1990). "Substantial solicitation, on the other hand, in addition to a showing of some other substantive activity in the state, could justify a finding of personal jurisdiction." *Daewoo Int'l Corp. v. Orion Eng'g & Serv.,* 2003 WL 22400198, 2003 U.S. Dist. LEXIS 18696 (S.D.N.Y. 2003).

Here, not only has Genpharm alleged that Pliva has engaged in substantial solicitation, it appears from Pliva's submissions that it probably has solicited business. Pliva has not refuted Genpharm's allegations of solicitation and admits to selling over five-million dollars worth of pharmaceuticals in New York from 2001 to 2003. Therefore, construing all of the allegations in favor of the Plaintiff, the Court finds that Genpharm has met its burden of making a prima facie showing of personal jurisdiction under CPLR 301.

In addition, Genpharm claims that Pliva "does business" in New York by virtue of the activities of its subsidiary, Pliva USA. The mere presence of a subsidiary in New York does not establish the parent's presence in the state. *Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.,* 751 F.2d 117, 120 (2d Cir. 1984). "To establish that a subsidiary is an agent of the parent, the plaintiff must show that the subsidiary 'does all the business which [the parent corporation] could do were it here by its own officials.'" *Jazini v. Nissan Motor Co., Ltd.,* 148 F.3d 181, 184 (2d Cir.1998) (quoting *Frummer v. Hilton Hotels Int'l, Inc.,* 19 N.Y.2d 533, 537, 281 N.Y.S.2d 41, 227 N.E.2d 851, *remittitur amended,* 20 N.Y.2d 737, 283 N.Y.S.2d 99, 229 N.E.2d 696 (1967)).

Genpharm's amended complaint alleges, in pertinent part:

[Pliva] has created various subsidiaries in the United Stated that serve no other business purpose or goal except to act solely as agents of Pliva; these subsidiaries include a wholly-owned subsidiary ... with the same name ... that serves no other business purpose or goal except to act solely as Pliva's agent to distrib-

ute and facilitate the sales, promotion, and market research of Pliva's pharmaceutical products and API in the United States and within this District and to solicit buyers of these pharmaceutical products.

Plt.'s Compl. at ¶ 21

The Defendants argue that Pliva USA is a wholly-owned subsidiary that observes all the corporate formalities and does business in its own name separate and apart from Pliva. This averment, by itself, does not contradict Genpharm's allegations that Pliva USA acts as Pliva's agent. The only other assertions that the Defendants make regarding the relationship between Pliva and its wholly-owned subsidiary Pliva USA is that Pliva sells and ships products to Pliva USA, which then resells them as property of Pliva USA. In sum, when construed in the light most favorable to the Plaintiff, Pliva's submissions do not refute Genpharm's allegations. Therefore, the Court finds that Genpharm has sufficiently alleged jurisdiction over Pliva through its subsidiary Pliva USA.

■ The Court also finds that jurisdiction over Pliva, if proven, would not run afoul of the Defendants' rights under the Due Process Clause of the Fifth Amendment. "[W]hen the cause of action does not arise out of or relate to the foreign corporation's activities in the forum State, due process is not offended by a State's subjecting the corporation to its in personam jurisdiction when there are sufficient contacts between the State and the foreign corporation." *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984); (citing *Perkins v. Benguet Consolidated Mining Co.,* 342 U.S. 437, 72 S.Ct. 413, 96 L.Ed. 485 (1952)); *see also Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 779–80, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984). Here, sufficient contacts would exist if the Plaintiff's theory of jurisdiction is established by a preponderance of the evidence.

As for Pliva–Lachema, Genpharm asserts that it is an alter-ego of Pliva. Again, the Defendants claim that Pliva–Lachema, like Pliva USA, acts as an independent entity that observes all the formalities. When the activities of a parent corporation show a disregard for the separate corporate existence of the subsidiary, New York law allows jurisdiction to be asserted over the subsidiary. *See Public Administrator v. Royal Bank,* 19 N.Y.2d 127, 278 N.Y.S.2d 378, 224 N.E.2d 877 (1967). In deciding this issue, it is essential that there is common ownership between the corporations. *Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.,* 751 F.2d 117, 120 (2d Cir.1984). Other factors that the court looks at include: (1) the financial dependency of the subsidiary on the parent corporation; (2) the degree to which the parent corporation interferes in the subsidiary's affairs; (3) the failure to observe corporate formalities; and (4) the degree of control over the marketing and operational policies of the subsidiary exercised by the parent. *Id.* The Court notes that application of these factors for jurisdiction requires a less onerous standard than that necessary to pierce the corporate veil for liability purposes. *See Marine Midland Bank, N.A. v. Miller,* 664 F.2d 899, 904 (2d Cir.1981)

The Court finds that the jurisdictional landscape painted by the parties is quite murky, and basically unhelpful to resolving this issue. A court may allow discovery to aid in the determination of whether it has personal jurisdiction. *See Winston & Strawn v. Dong Won Securities Co.,* No. 02–0183, 2002 WL 31444625, at *5 (S.D.N.Y.2002). "While a showing of agency for jurisdictional purposes will not be inferred from the mere existence of a parent-subsidiary relationship ..., at this

juncture, [the Plaintiff] should be allowed to learn whether the complex corporate relationships involved the parents' exercise of control over [its] subsidiar[y]." *Edelman v. Taittinger, S.A.*, 298 A.D.2d 301, 302, 751 N.Y.S.2d 171 (1st Dep't 2002) (citations omitted). Pre-motion discovery should also be permitted when the facts necessary to establish personal jurisdiction lie within the defendants exclusive knowledge. *See Wells Fargo & Co. v. Wells Fargo Express Co.*, 556 F.2d 406, 430 n. 4 (9th Cir.1977).

In this case the Court is faced with substantial questions of fact regarding the relationship of the Defendant companies with each other, with Pliva USA, and with New York. Discovery will lead to a more open and fruitful examination of the true character of the business dealings Pliva and Pliva–Lachema have in this forum. In addition, discovery will allow the parties to paint a better picture for the Court of the corporate structure of the various entities. Without these essential elements, the Court is unable to determine whether Pliva–Lachema is the alter-ego of Pliva so as to meet the requirements of New York's jurisdictional statute.

### III. Forum Non–Conveniens

■ At the outset of their forum non conveniens response, the Plaintiff suggests that the Defendants late motion to dismiss for forum non conveniens makes it ineligible for consideration. The Court disagrees. There appears to be "no time limit on when a motion to dismiss on the ground of forum non conveniens can be made." 15 Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper Fed. Prac. & Proc. § 3828 (2d ed.2004); *see Jacobs v. Felix Bloch Erben Verlag fur Buhne Film und Funk KG*, 160 F.Supp.2d 722, 742 (S.D.N.Y.2001); *Breindel & Ferstendig v. Faber*, No. 95–7905, 1996 WL 413727, at *3 n. 1, (S.D.N.Y. July 24, 1996). However, the defendant's delay in bringing a forum

non conveniens motion is a factor to be considered in the Court's evaluation of whether the forum was convenient. *Id.*

■ A district court has the inherent power to dismiss an action under the doctrine of forum non conveniens when it appears that a foreign forum would be more convenient. *Schertenleib v. Traum*, 589 F.2d 1156, 1163 (2d Cir.1978). In a forum non conveniens analysis, a court must first determine what level of deference to accord a plaintiff's choice of forum. *DiRienzo v. Philip Servs. Corp.*, 294 F.3d 21, 28 (2d Cir.2002) (citing *Iragorri v. United Techs. Corp.*, 274 F.3d 65, 73 (2d Cir.2001)). After this is decided, a court must consider whether there is an adequate alternative forum. *Iragorri*, 274 F.3d at 73. If one exists, a court must then weigh the relative convenience of the forums by evaluating certain private and public interest factors. *Id.* "The greater the degree of deference to which the plaintiff's choice of forum is entitled, the stronger a showing of inconvenience the defendant must make to prevail in securing forum non conveniens dismissal." *Id.* at 74.

### A. The Deference Owed to the Plaintiff's Choice of Forum

■ The Second Circuit has established a "sliding scale" approach to determine the proper deference to accord a plaintiff's choice of forum. *Id.* at 71. Under that scale, "the greater the plaintiff's or the lawsuit's bona fide connection to the United States and to the forum of choice and the more it appears that considerations of convenience favor the conduct of the lawsuit in the United States . . .,[the greater deference must be accorded the plaintiff's choice of a forum, and] the more difficult it will be for the defendant to gain dismissal for forum non conveniens." *Id.* at 72. Where, as here, the Plaintiff chooses to

initiate a suit in a forum it has no connection to, the choice of forum is not entitled to the same substantial deference. *See Pollux Holding Ltd. v. Chase Manhattan Bank*, 329 F.3d 64, 74 (2d Cir.2003).

## B. The Alternative Forum

■ Next, the Court must determine whether an adequate alternative forum exists. "An alternative forum is adequate if: (1) the defendants are subject to service of process there; and (2) the forum permits 'litigation of the subject matter of the dispute.'" *Alfadda v. Fenn*, 159 F.3d 41, 45 (2d Cir.1998) (citing *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 254 n. 22, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981)). The Defendants have submitted that they would be amenable to service in the Czech Republic. Since the Plaintiff has not asserted that the Czech courts are in any way inadequate, it appears that the Czech Republic is an adequate alternative forum.

## C. The Balancing of the Interest Factors

■ Having determined that an adequate alternative forum exists, the Court must weigh the Defendants' hardships if jurisdiction is retained in the forum of the Plaintiff's choice against the Plaintiff's hardships if the motion to dismiss is granted and the Plaintiff is forced to begin the suit anew in the Czech Republic. *See Pollux*, 329 F.3d at 75.

The Second Circuit has endorsed the non exclusive list of factors delineated in the seminal case of *Gulf Oil Corp. v. Gilbert* in evaluating a forum non conveniens motion. 330 U.S. 501, 508, 67 S.Ct. 839, 843, 91 L.Ed. 1055 (1947). The private interest factors are: (1) the relative ease of access to evidence; (2) the cost to transport witnesses to trial; (3) the availability of compulsory process for unwilling witnesses; and (4) other factors that make the trial more expeditious or less expensive. *Iragorri*, 274 F.3d at 73–74. The

public interest factors are: (1) settling local disputes in a local forum; (2) avoiding the difficulties of applying foreign law; and (3) avoiding the burden on jurors by having them decide cases that have no impact on their community. Id. at 74; *see also Gilbert*, 330 U.S. at 508, 67 S.Ct. 839, 843, 91 L.Ed. 1055.

The private interest factors favor the Plaintiffs. This case has been pending since June 6, 2003. Although the parties have not engaged in extensive discovery, the Defendants have sought to stay and delay discovery at every step of the case. In addition, as noted above, the Court can consider the fact that the Defendants have moved for dismissal based on forum non conveniens more than a year after the case was filed. *See Breindel & Ferstendig*, 1996 WL 413727, at *3. Moreover, the Defendants' strongest argument that the witnesses and parties have no connection to this forum, is discounted by the fact that they collectively have virtually no connection to any forum foreign or domestic. The Plaintiff is a Canadian corporation while the Defendants are located in the Czech Republic and Croatia. Witnesses and documents are scattered throughout the world in countries such as Germany, the United Kingdom, and Canada. Moving this case to the Czech Republic, as the Defendants urge, only shifts the inconvenience from the Defendants to the Plaintiff, which is not a reason to relocate the case. *See Teevee Toons, Inc. v. Gerhard Schubert GMBH*, No. 00–5189, 2002 WL 498627, at *8 (S.D.N.Y.2002); *Jacobs*, 160 F.Supp.2d at 743–44 (S.D.N.Y.2001); *ESI, Inc. v. Coastal Power Prod. Co.*, 995 F.Supp. 419, 429 (S.D.N.Y.1998).

The public interest factors also favor the Plaintiff. The alleged contract involves the development of a drug intended for sale in the United States. From the allegations in the amended complaint, it

appears that the customary practices between pharmaceutical companies with regard to the FDA approval process may be an integral part of the case. This case would not burden jurors by having them decide a case that does not impact their community because the plaintiffs do not have their principal place of business in this district. In fact, the jurors may be interested in resolving an issue involving generic drugs that were to be sold in this country.

The Defendants request that this Court follow a case from the Northern District of California, *Chateau des Charmes Wines Ltd. v. Sabate USA, Inc.*, No. 01–4203, 2003 WL 22682483, at *1, 2003 U.S. Dist. LEXIS 20337, at *1 (N.D.Cal.2003), in which the court dismissed a Canadian winemaker's suit against a French cork manufacturer and its United States distributor on the ground of forum non conveniens. Like this case, the defendant in *Chateau* belatedly moved for dismissal and the all of the witnesses and parties had no connection to the forum. However, other than those factors, the facts of this case bear little resemblance to *Chateau*. Further, the Supreme Court has repeatedly emphasized the need for flexibility in forum non conveniens analysis. *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 249, 102 S.Ct. 252, 262, 70 L.Ed.2d 419 (1981).

This case centers around an alleged breach of contract for the production of a generic pharmaceutical, which involved the FDA's complex approval process. A United States Federal District Court is uniquely suited to handle issues involving the FDA approval process as compared to a foreign court. The *Chateau* case involved a contract for cork-based closures used in bottling wine, an issue that can be handled by any competent court. In addition, the generic drug was intended for sale in the United States, and as such, may have benefitted the citizens of this country.

Based upon a review of the private and public interest factors, the Court finds that the defendants have failed to show that the Czech Republic is a more convenient and just forum than the Eastern District of New York. Accordingly, the motion to dismiss the amended complaint on the ground of forum non conveniens is denied.

## CONCLUSION

Based on the foregoing, it is hereby

**ORDERED,** that the Defendants motion to dismiss is DENIED in its entirety.

**SO ORDERED.**